Grimes v. Emery.

No. 18,946.

E. E. GRIMES, *Appellee,* V. ROLLA C. EMERY, *Appellant.*

SYLLABUS BY THE COURT.

AGENCY—*Commissions*—*Whether an Agent Was the Procuring Cause of a Sale of Land Was for the Jury.* Where upon a trial there was evidence tending to support two entirely different states of fact—one of which, being found by the jury, entitled the plaintiff to a verdict and the other would, if found, have entitled the defendant to a verdict—and where in such case the jury returned a verdict for the plaintiff which the court approved by rendering judgment in accordance therewith; *held,* that the judgment will not be reversed by this court.

Appeal from Ottawa district court; DALLAS GROVER, judge. Opinion filed July 7, 1914. Affirmed.

*David Ritchie,* and *G. A. Spencer,* both of Salina, for the appellant.

*E. C. Sweet,* of Minneapolis, for the appellee.

The opinion of the court was delivered by

SMITH, J.: Prior to April 12, 1912, the appellant was the owner of 220 acres of land in Ottawa county, Kansas, and the appellee was a real-estate agent doing business at Minneapolis in that county. In the fall of 1911 the appellant employed the appellee to find a purchaser for the land at $75 per acre and agreed to pay him five per cent on the first $1000 received and two and one-half per cent on the remainder. Grimes went to see one John Kline, who afterwards bought the land, about selling the land to him. Kline lived about fourteen miles from Minneapolis, and near Ada. Grimes talked with Kline about the land and gave him the location of the land and the name of the owner, and the appellee went a second time to see Kline. Thereafter the appellant sold sixty acres of the land, leaving 160 acres. After this sale the appellee and the appellant

met and had the following conversation, as appears by the evidence of the appellee and is not disputed:

"Q. Repeat the conversation? A. I said to Mr. Emery 'I note you have sold a part of your land' and he said 'yes' and now I says, 'I believe I can bring a man from north of Ada that can handle that land at this time, I think you have got it down to where he can handle it,' and I said 'Would you do any better than $75.00 an acre on this land?' and he said 'if you could sell this land right away, he would do some better than that' and I told Mr. Emery that I would go right out and see the party within a day or two, as soon as I could get away, I told him if he thought we could make satisfactory terms, and he said he thought he could.

"Q. Were the terms revised at that time? A. No.

"Q. What, if anything, did you do after that with reference to that land? A. On the 15th of February I went to see Mr. Kline and I saw him and told him that Mr. Emery had sold 60 acres of this land, leaving 160, and that Mr. Emery told me that if he could sell it right away, he would do a little bit better than $75.00 an acre, and I told Mr. Kline that I couldn't give him the definite price, that the price that was given to me was $75.00 per acre, but I told him what Mr. Emery had said.

"Q. What did you tell him? A. I told him that Mr. Emery had said that he would do a little bit better if he sold it soon, and I told him that Mr. Emery had said that the terms would be made so that he could handle it.

"Q. And what did Mr. Kline say? A. Mr. Kline told me that he was going to look at some land first before he did anything here.

"Q. How far did this land lay from where Mr. Kline lived at that time? A. About 10 or 11 miles I think.

"Q. Did you ever give Mr. Kline the description of this piece of property? A. No sir, nothing more than I told him where it was, I didn't give the legal numbers.

"Q. How many conversations did you have with Mr. Kline about this land between November and the following April when he bought? A. I think I was there on five different occasions that I talked to him about the place.

"Q. And this last trip you say, was on the 15th of February? A. Yes sir, that was especially to see him.

.   .   .   .   .   .   .   .   .   .

"A. I told Mr. Emery in the conversation about the 13th of February that I had a party I thought I could sell to, a young man north of Ada.

"Q. You didn't tell him who it was? A. No sir.

"Q. You never did at any time tell him who your customer was? A. No sir, we don't tell those things.

"Q. And on the 13th you told him you thought you had a young man that would take his farm? A. Yes sir."

There seems to be no contradictions of this evidence except that the purchaser, Kline, testified that appellee was at his place twice, while Grimes says that he was at Kline's place five different occasions, and talked with him about the place.

Grimes also testified:

"Q. You did n't even get Kline to go and look at the farm? A. I tried.

"Q. Did you ever obtain his consent to go with you to the farm and look at it?  .  .  .  A. He promised me one time that he would come and look at the farm.

"Q. Did he make a date when he would ever come and look at it? A. No sir, it was impossible to get a date with him because he was feeding cattle.

"Q. Did you ever at any time take him over there and show him the farm? A. No sir.

"Q. Did you ever get any contract from Mr. Kline of any kind by which he agreed to take this farm on any terms? A. No sir.

"Q. Did you ever get any promise at any time that he would go and take it upon any terms? A. No sir, but he agreed to go and look at it.

"Q. You don't know at any time whether he was ever ready to purchase the farm at $75 an acre? A He had n't seen it.

"Q. You don't know whether he was at any time ever ready to purchase it at any price, so far as you were concerned? A. I don't suppose he was until he saw it."

Mr. Kline testified as follows:

"Well the way I happened to go down to it, Mr. Sedilick of Ada had a farm over west three miles from the place I bought, and he told me to go and look at it, and one time in April I told him I was going over to see it and Mr. Sedilick came along and took me over there, and it did n't suit me and we came back, we were on this side of the farm and inquired of Mr. Harris if he knew of any land for sale, and he said that he had some land for sale, and Mr. Sedilick, Mr. Harris and I drove over it and it did n't suit me, and we took dinner with Mr. Harris, and then we came down to where Mr. Goff lives and we asked him if there was any land for sale that he knew of, and he told us about the Rolla Emery farm was for sale, so we came on down then at another place and inquired if that was for sale, so then we came down to look over the Rolla Emery place, and then we came down to see Mr. Emery, and that is the way I got down there.

"I talked to Emery about place and he finally said he would take $11,200.00; I then went home and brought my wife down and again looked over farm, we then come to Minneapolis and closed deal."

The effect of the instructions given in the case is that if the appellee was the procuring cause of Kline's going to see the land and buying it of the owner that the appellee was entitled to recover his commission at the rate agreed upon, on the amount received by appellant for the land.

The appellant contends that under the evidence in this case the appellee did not bring the seller and the purchaser together or institute a contract between them and hence did not earn any commission. Numerous authorities are cited, the language of which differs mainly upon what constitutes a bringing of the seller and purchaser together or the producing of a purchaser to the seller who is ready, willing and able to purchase the property upon the terms and at a price designated by the owner, but none of them so inconsistent with the general doctrine that where a broker is employed to sell real estate for a commission and by

any means is the procuring cause of bringing the seller and a proposed buyer together and a sale is consummated, either with or without the assistance of the broker, the broker is entitled to his commission.

In *Marlatt v. Elliott,* 69 Kan. 477, 77 Pac. 104, it was said:

"It is sufficient to entitle a real-estate agent to recover his commission for the sale of land that he, under a contract with the owner thereof, has been the procuring cause of such sale.    He need not have conducted it to a final and successful conclusion." (Syl. ¶ 1.)

It is contended by the appellant that under the facts of this case it was a question of law for the court to answer whether or not the broker was entitled to his commission, but we think the court correctly submitted the question to the jury as a question of fact whether the broker was or was not the producing cause of the sale.    The contract between the appellant, as owner, and appellee, as broker, is not questioned, and it appears from the evidence that the broker then informed the owner that he believed he could sell the land to a man up near Ada, where, in fact, the purchaser resided; also that the broker soon thereafter went to see the purchaser and at that time was unable to get him to go and see the land.    Inferentially, it appears that the purchaser did not want to buy as large a tract as 220 acres, and the broker, being thereafter informed by the owner that he had sold 60 acres of land, returned to the purchaser and secured a promise from him to go and see the land, but at no time did the broker go with the purchaser to the land.    The purchaser, however, had been given the name of the owner and the general location of the land although not the exact description by township and sectional divisions.    An apparent reason for the broker's not going with the purchaser to see the owner and inspect the land was that the purchaser lived about eighteen

miles from the broker's place of business and the land was ten or eleven miles in another direction. There is no evidence to indicate that the purchaser had known anything about or had heard of this land being for sale, except through the broker, until he was on the way there to see it after looking at two other tracts.

It is also urged that the broker did not find a purchaser at the price, $12,000, at which he was authorized to sell the land but that the land was sold for $11,200. There is uncontradicted evidence, however, that the owner, after he had sold off the 60-acre tract, had informed the broker that he would make a reduction from the price of $75 per acre if the broker could sell it soon and that the broker so informed the purchaser. A reduction of $800 was made from the price at which the broker was first authorized to sell the land, and relatively that might not be considered a large reduction from the original price named.

There is no evidence that the seller had employed any other agent or broker to sell the land and he was informed by the appellee that his prospective buyer lived near Ada, and at the time the buyer came to his place the seller did not inquire if he had been negotiating with the broker, Grimes, but asked if he had been sent there by any agent. To this the buyer said, "No."

There is little, if any, direct conflict in the evidence, but the evidence tends to prove two different states of facts; one that the purchaser learned that the land was for sale and went to look at it with a view of buying it by reason of the solicitation of appellee; and the other that the buyer was out looking for land and that through means other than the solicitation of this broker he learned that this land was for sale and went to the premises and bought it of the owner without reference to the broker. Under the first state of facts, the seller would be responsible to the broker for the commission; under the second, he would not. It

was a question of fact fairly submitted to the jury, who found in favor of the broker upon sufficient evidence. Judgment was rendered accordingly, and it is affirmed.

PORTER, and BENSON, JJ., dissenting.