No. 37,305

R. W. PATEE, doing business as Patee Realty & Investment Company, *Appellee*, v. J. S. MOODY, *Appellant*.

(199 P. 2d 798)

Opinion filed November 30, 1948.

*Ben Jones,* of Lyons, argued the cause, and was on the briefs for the appellant.

*Harold Gibson,* of Lyons, argued the cause, and was on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action by a real-estate broker to recover a commission. The plaintiff prevailed and the defendant appeals.

Appellant's principal contention is that the evidence was insufficient to establish a contract of employment, either express or implied, between the parties, and that his demurrer to the plaintiff's evidence should have been sustained. Appellant contends, further, that the court erred in overruling his motion to withdraw the case from the jury and to dismiss the jury because of misconduct of counsel for the plaintiff in his argument to the jury. Also, that the court erred in denying appellant's motion to require the jury to return a more complete answer to a special question submitted to it.

In his petition, the plaintiff, R. W. Patee, a resident of Lyons, Kan., alleged that he was a real-estate broker and as such had the residence property of H. R. Welch, in Lyons, listed for sale; that he advertised it for sale and contacted prospective buyers; that on or about June 24, 1947, J. S. Moody, the defendant, called upon him and inquired about the Welch property and was informed about the price and the items included in the property; that on June 26 he exhibited the Welch property to the defendant and on the same date exhibited to Welch a residence property belonging to Moody; that on June 28 the defendant agreed to buy the Welch property and Welch agreed to sell and an agreement was drawn under which the defendant was to buy the Welch property and lease his property to Welch, but the agreement was not executed by the defendant; that on the evening of June 28 the defendant called the plaintiff and stated that he desired to sell his property to Welch and plaintiff said he would get in contact with Welch and that if a sale was consummated defendant would pay a five percent commission; that plaintiff did get in touch with Welch, and defendant's property was included in the purchase price of the Welch property for $7,750. Plaintiff asked judgment for $387.50.

In his answer defendant denied generally the allegations of the petition and specifically denied that he had employed the plaintiff as an agent for any purpose, that he had employed him to sell any property, or that he agreed to pay any commission for sale or trade of property as alleged. The reply was a general denial.

The case was tried by a jury and at the close of plaintiff's evidence the defendant demurred to the evidence on the ground that no cause of action had been shown. The demurrer was overruled, and defendant's evidence was received.

At the conclusion of the closing argument to the jury by counsel for the plaintiff, the defendant moved that the case be withdrawn

from the jury and the jury be dismissed because of improper conduct of counsel in his argument. It is not necessary to set out in full what took place on this matter. It will suffice to say that in his argument counsel stated that the defendant had testified falsely with reference to the basis of computation upon which the trade of properties had been consummated; that upon objection to this statement by the defendant the court cautioned the jury that they were at liberty to disregard any statements by counsel not borne out by the evidence; that after being so cautioned and the reporter having been asked to take down the remainder of the argument, counsel for plaintiff repeated substantially the same statement, though in somewhat different words, and told the jury that they should disregard all of the defendant's testimony.

The jury returned a verdict for the plaintiff in the amount asked and answered special questions as follows:

"1. Did the defendant, J. S. Moody, employ the plaintiff, R. W. Patee, to sell or exchange his (Moody's) house? A. Yes.

"2. If you answer the foregoing question in the affirmative, then state when and where the defendant Moody employed the plaintiff Patee? A. Where—Lyons, Kans. When— When Mr. Moody gave Mr. Patee permission to contact & make an appointment with Mr. Welch. Both parties understanding a trade was involved.

"3. If you have found that the defendant Moody employed the plaintiff Patee to sell or exchange his house, then state the amount of the price for which Patee was to sell or exchange the house belonging to Moody? A. $7,750.00.

"4. Was the exchange of the house owned by the defendant Moody brought about by the efforts of the plaintiff, Patee, acting as the agent of the defendant Moody? A. Yes.

"5. If you answer the last question in the affirmative, then state what the plaintiff Patee did to bring about the exchange of the house owned by Moody in this transaction. A. The plaintiff Mr. Patee was instrumental in bringing the two parties together, which resulted in a completion of the negotiations."

Motions of the defendant to set aside the answers, for judgment, and for a new trial, were overruled and this appeal followed.

Examination of the record, which is comparatively short, makes it clear that if the plaintiff's evidence be held sufficient to establish a contract of employment by the defendant and to support a finding that the efforts of the plaintiff were the procuring cause of the consummated deal, such conclusion must rest entirely upon the testimony as to one telephone conversation, to which reference will presently be made. Prior to that there was nothing which in any

way could be said to constitute employment of Patee by Moody. Welch had listed his house for sale with Patee, and the Welch place had been advertised. Moody went to see Patee about the Welch property—presumably having seen the advertisement—and asked if Welch would consider taking in his house on a trade. Patee told him Welch would have to have a place to live and was interested in any kind of a trade provided it was something that suited him. The Moodys inspected the Welch property and the Welches inspected the Moody property. After Patee took the Welches back to their home, after they had inspected the Moody property, Welch stated that he would be interested in taking in the Moody property at $7,500. Patee so reported to Moody but Moody said he wasn't interested in trading his house at that price, and would much prefer to buy the Welch property for $15,500 cash. After Moody stated that he wasn't interested in selling his property at $7,500, Patee dropped any deal in regard to that—according to his own testimony —and attempted to sell the Welch property to him for $15,500.

Following that, Patee had conversations with Moody relative to renting his house to Welch and Welch agreed to pay $50 monthly rental for the Moody place. An attorney was employed to draw up an agreement for sale of the Welch property and lease of the Moody property. On a Saturday evening Patee called Moody to tell him the agreement had been drawn up and he would like to have him sign it. Patee had made it known that he planned to leave the next morning on a trip to Wyoming to be gone for some time. Moody was not at home when Patee called, but called Patee later that evening and said he had been thinking it over and had decided he didn't want to enter into the proposed agreement to lease his place for a year with privilege of renewal, because that would tie him up so he couldn't sell his place if he wanted to do so. Then followed the testimony upon which appellee relies, as follows: (Testimony of R. W. Patee)

". . . he proceeded to ask me if Mr. Welch would consider taking it in on a trade. I said, 'Yes, he would; he had already offered you $7,500.00.' Then Mr. Moody wanted to know if he could talk to Mr. Welch about a trade. I says, 'Well, I am leaving in the morning and will call Mr. Welch and find out if he would care to talk to him.' I said, 'Jim, if you trade your house in, you are going to have to pay part of the commission, because Mr. Welch will not trade any other way and pay a full commission on your house.' And he says, 'How much is the commission?' I said, 'Well, if he takes the house in on a trade at $7500.00 it would be almost half the commis-

sion or whatever it figures at five per cent.' Mr. Moody didn't say anything for a few minutes and I assumed he was thinking about it. He said, 'Well, go ahead, and see if I can see Mr. Welch.' So I called Mr. Welch and told him Mr. Moody didn't want to buy his house for cash, but wanted to trade, and would he consider a trade. He said, 'Yes,' he would consider a trade at his figure of $7500.00. I said, 'Well, Mr. Moody wants to talk to you, and I am going to have to leave in the morning, and is it all right for him to come over and see you?' He said, 'Yes, it is all right, if he comes over here tomorrow morning before noon, because I am going to the ball game.' And he says, 'Does he understand about the commission?' And I says, 'Yes, I just finished talking and telling him about it.' He says, 'Well, okay, then, you go ahead and whatever we work out, we can finish up when you come back.' And when I talked to Mr. Moody before on the telephone, he had mentioned that, too, that the deal could be completed if they could arrive at some terms, when I returned from Wyoming. That is all the conversation I' had with Mr. Moody and Mr. Welch before going to Wyoming."

The above telephone conversations took place on a Saturday evening. The next morning Patee went to Wyoming, and when he got back some weeks later, Moody and Welch had agreed on a trade, the Moody place being figured at $7,750 instead of $7,500 and Welch receiving $7,750 in cash, upon which amount he paid Patee a five percent commission. Exchange of occupancy had taken place before Patee got back.

Patee testified that after he got back he asked Moody for his commission and Moody said the amount asked was too much, but agreed to think it over. In considering the issue presented by the demurrer, we are of course not concerned with Moody's version of the conversations or transactions had with Patee except to say that the defendant's evidence did not supply any insufficiency that may have existed in plaintiff's evidence.

In the very recent case of *DeYoung v. Reiling,* 165 Kan. 721, 199 P. 2d 492, we had occasion to consider again some of the questions relating to a real-estate broker's right to a commission. Whether a broker has been employed as an agent to effect a sale or trade of property for his principal and whether he was the procuring cause of a consummated deal is ordinarily a question for the trier of the facts, to be determined in the light of all the facts and circumstances up to and including the final negotiations between the seller and purchaser (see many authorities in the opinion in the above case).

The primary relation, as between customer and a real-estate broker, is that of agency, and the general rules of law applicable to principal and agent govern their rights and liabilities (12 C. J. S.

29 *et seq.*, 8 Am. Jur. 997 *et seq.*)   Furthermore, agency can result only from contract, express or implied, and in determining whether a valid contract has been entered into, the rules which pertain to contracts generally are applicable.   There must be consideration, mutuality and a meeting of the minds as to essential matters. Meeting of the minds may be shown by implication, by conduct of the parties (12 C. J. S. 32 *et seq.*, 8 Am. Jur. 998 *et seq.*).   Like other features essential to a cause of action, the burden of establishing agency is upon the party asserting it (12 C. J. S. 38).

Construed most favorably to the plaintiff, as must be done in testing the sufficiency of his evidence as against demurrer, can it be said that there was substantial evidence to establish a binding contract of employment of the plaintiff as an agent of the defendant, and that the plaintiff was the procuring cause of the deal consummated between the defendant and Welch?   In considering that question we must consider the evidence as a whole and not simply upon some part lifted out of context.

There is no evidence and no contention that prior to the Saturday-night telephone conversation Moody had listed his property with Patee or had in any way made Patee his agent.   All negotiations by Patee had been exclusively as the agent of Welch.   Patee had advertised the Welch property and as a result Moody went to see Patee about buying the Welch property.   All conversations about the Moody property related to the question whether Welch would consider taking it in as part of the deal for disposing of his property.   Welch had objected to paying a commission to Patee on the full amount of the deal in case he took the Moody property as part payment.   This was a matter entirely between Welch and Patee. On the Saturday evening Moody called Patee to ask him if Welch would consider taking the Moody property in on a trade.   Patee— speaking as an agent of Welch—replied that he would and had already offered to take it in at $7,500.   Moody wanted to know if he could talk to Welch about a trade.   Patee replied that he was leaving in the morning and would call Welch and find out if he would care to talk to him.   We think it clear that in finding out whether Welch would care to talk to Moody, Patee was still acting as the agent of Welch.   Then Patee told Moody that if they made a trade Welch would not pay the full commission and that Moody would have to pay part of it.   Moody inquired and was advised as to the amount of the commission.   Moody replied "go ahead and

see if I can see Mr. Welch." From this answer, it is contended that Moody made Patee his agent in the sale or trade of the Moody property to Welch, and agreed to pay part of the commission in case he and Welch came to terms. We think this falls short of the certainty necessary in establishing a binding contract. All that Moody said was that Patee, who throughout all prior negotiations had been acting solely as the agent of Welch, could go ahead and see if he could see Welch. Moody said nothing about paying the commission. He did not authorize Patee to represent him in a trade with Welch. He only said that Patee could see if he could see Welch. Where was there any consideration in that? He could have seen Welch without any call by Patee. If Patee had an intention of holding Moody to a contract of employment, he should have had something more definite than his own inference that Moody was agreeing to employ him and pay a commission simply because he did not say he would not do so. It is not contended that Patee had thereafter any connection with the negotiations between Moody and Welch or was in any way instrumental in closing the deal. Real-estate broker contracts are to be treated the same as any other contracts—that, and nothing more. There must be a meeting of the minds, consideration, mutuality, certainty. We are not willing to say that the evidence here was sufficient to establish a binding contract between Moody and Patee. To do so would make it possible for a broker, upon the merest assumption of consent, to show a binding contract of employment.

Whatever conversation Patee had with his principal Welch about Moody paying part of the commission could not be binding upon Moody. Nor can the subsequent conversation with Moody, to which Patee testified, in his effort to get Moody to pay a commission, be said to establish the prior making of a contract.

We conclude that plaintiff's evidence was insufficient to establish his cause of action and that the demurrer thereto should have been sustained. This conclusion makes it unnecessary to consider appellant's other contentions.

The judgment is reversed with directions to sustain defendant's demurrer to plaintiff's evidence.

Parker, J., dissents.