No. 42,493

Jack M. Gleichenhaus, *Appellant*, v. James V. Pratt, *Appellee.*

(372 P. 2d 273)

Opinion filed June 9, 1962.

*Michael A. Barbara,* of Topeka, argued the cause and was on the briefs for the appellant.

*Warren W. Shaw,* of Topeka, argued the cause and *Wendell L. Garlinghouse, William Hergenreter* and *Carl W. Quarnstrom,* all of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Jackson, J.: The appellant, a realtor, brought this action against appellee-defendant claiming that defendant owed plaintiff a real estate commission. The trial court sustained a demurrer to plaintiff's evidence and he appeals.

The trial court remarked when sustaining the demurrer that plaintiff had failed to prove any contract for such a commission.

We have a motion to dismiss the appeal based upon the fact that the transcript was not filed with the clerk of the district court all as provided by G. S. 1949, 60-3311. Plaintiff filed the transcript as soon as the matter was brought to his attention. Although this is ground for dismissing the appeal, the court has tended to be lenient where no real embarrassment to the opposite party has resulted. (*In re Estate of Rosey,* 187 Kan. 254, 356 P. 2d 849: *Zerger v. Stucky,* 186 Kan. 142, 348 P. 2d 612.) But appellants must not trade on the good nature of the court, because the rule is one that should be observed. Since defendant had a copy of the transcript himself and admits no inconvenience, we pass the matter.

The plaintiff is a licensed real estate broker in Topeka. In the early part of 1959, plaintiff appears to have been endeavoring to find a new store building for Louis Pozez, a business man of the city. Plaintiff first showed Pozez a store building near Tenth and Mulvane. Then plaintiff took Pozez to the Hollywood-Maxwell building which, we are told, is owned by Doris Pratt. The next day, Mr. Pozez and plaintiff called on defendant Pratt. This last building apparently would not do because of its lack of parking space.

Later, plaintiff arranged for Pozez and Pratt and finally Pratt's attorney Mr. Shaw to visit a site spoken of as the Meadow Acres site, which was owned by a Mrs. Sperry. During the conversation with Mrs. Sperry it was definitely established that Mrs. Sperry had an agency contract with plaintiff and would pay him a commission on a sale of the site. The idea at that time seems to have been that defendant Pratt would buy the site, put up a building, and lease it to Pozez. The Meadow Acres site was not purchased, however.

Later, Mr. Pozez called Mr. Palmer, a long-time friend of his, who owned some land on Topeka Avenue. Pozez discussed with Palmer the possibility of Palmer putting up a building for Pozez which Palmer felt that he could not do at that time. Whereupon, Mr. Pozez suggested that perhaps they should go to see Mr. Pratt.

Pozez and Palmer did contact defendant Pratt and after considerable time a plan was worked out among the three of them whereby Palmer leased his land to defendant Pratt who thereupon constructed a store building for lease to Pozez who leased the building from defendant for a term of fifteen years at the rent of $3,780 per

month, together with an option of renewing the lease at the same rent for another fifteen years.

The plaintiff makes no claim that he had anything to do with procuring the appearance of Palmer nor that he had any connection with the making of the lease involved in the arrangement between Palmer, Pratt and Pozez.

Plaintiff does claim he was the primary and producing cause of said lease agreement and that he found Louis Pozez who was ready, willing and able to enter into the lease agreement with Pratt.

The question in the case is, did plaintiff show that he had a contract in which defendant engaged plaintiff as his agent to find a lessor and if so, was it broad enough to cover the Palmer deal worked out by the parties thereto without plaintiff's help?

As has been said, the trial court that heard the evidence thought not and his oral statement was somewhat revealing:

"Gentlemen, I have reviewed this evidence that was introduced this morning, and after a thorough consideration I am just not able to find from this evidence that there was ever any contract of employment of any kind between these men, and to say nothing about trying to tell you what the terms of the contract were, so under those circumstances the demurrer to the evidence will have to be sustained."

The evidence at the trial consisted of the testimony of Mr. Pozez and of the plaintiff himself. The plaintiff has pointed out certain parts of his own testimony which he claims established a contract between defendant Pratt and himself. We shall set out these parts of the testimony for examination:

"A. Well, the first time I met him was on his Hollywood Maxwell building, I was trying to get a tenant for it.

"Q. When was this?

"A. This was early in '59.

"Q. And will you relate the conversation, if any, that transpired at that time in regard to any building?

"A. Well, Jim told me, he said if I ever had anyone that would be interested in having a building built, I mean this was just a side conversation, if I would have anyone that would be interested in having a building built for them, that he would build the building providing the situation was right and would take care of me as far as the commission."

After taking Mr. Pozez to see the Hollywood-Maxwell building, plaintiff reported to defendant as follows:

"A. Yes, I called him on the phone. I said I had showed his building that afternoon, that I had had someone that was possibly interested in it, and based on possibly getting the homes to the west of the property, so Jim said,

'Well, bring him in in the morning and we'll get into further detail, we will discuss the matter further.' So about 10:00 o'clock the next morning I went down and I got Louis, I forget whether we walked or whether we drove, but we went up to Mr. Pratt's office. We sat down and I, of course Jim knew why we were there—

. . . . . . . . . . . . . .

"A. Well, I repeated the question, I said, 'Jim, will you be interested in leasing the Hollywood-Maxwell building to Pozez,' I said, 'He might be interested if you would buy the adjacent property to the west and make parking out of it.' And Jim said that he wasn't interested in that. I said, 'Jim, would you be interested in building a new building for Mr. Pozez and leasing the building to Mr. Pozez.'

"Q. Now, was that your statement to Mr. Pratt?

"A. I asked him.

"Q. What was the response, if any?

"A. Well, Jim said he would be interested providing we would find the right location.

"Q. Was Mr. Pozez present at that time?

"A. Yes."

This later conversation was also testified to by plaintiff:

"Q. . . . Did you take Mr. Pozez out there to the site?

"A. I personally took him out there. I picked him up I believe down town and we drove out and parked on the Holiday Square parking lot and looked it over, and I think maybe later we drove over and through it.

"Q. And did at any subsequent time Mr. Pratt also go out to the site?

"A. After that, the next week I was in Jim's office and we got in his car, which I think was over in the Capital Super Service parking lot, we drove directly out there and we paced it off as far as the depth.

"Q. During this negotiation about the Meadow Acres site, had you had any conversation with Mr. Pratt in regard to any real estate fee?

"A. After I brought Louis to him Jim said to me one day he said, 'I have a certain architectural firm here in town that wanted to charge a 10 per cent promotional fee on top'—(interrupted)

"Q. Raise your voice.

"A. He said, 'I had a certain architectural firm here in town that wanted to charge me 10 per cent promotional fee on top of their regular fee, if you think I am going to pay you a 10 per cent promotional fee on top of your regular fee,' he said, 'I will pay you the customary real estate fee, but,' he said 'I am not paying you any 10 per cent promotional fee.' I said, 'Jim, that is fine, all I look to anyway is the real estate fee.'

"Q. Where did this transaction occur?

"A. This took place in his (Pratt's) office, I think 923 Kansas, or whatever it is."

We can only say that in our opinion the above testimony, giving it all benefit of liberal construction as we must on a demurrer, falls short of establishing a contract of brokerage as to the Palmer deal.

We do not have to decide whether plaintiff had any contract with defendant as to any of the properties he worked on. But there is nothing in the testimony about how long the contract, if there was one, was to last. Furthermore, the prime requisite was a site for the proposed building, as defendant remarked above. There is no intimation as to the amount of plaintiff's commission; and we now find that plaintiff claims he should receive a commission which might amount to $66,000 for merely introducing Pozez to Pratt. We are certain defendant never agreed to pay for a project which plaintiff had nothing to do with. The plaintiff is endeavoring to read something into the evidence which is not there.

In 12 C. J. S. Brokers § 60, p. 134 it is said:

"The right of a broker to recover commissions or other remuneration for his services must be predicated on a contractural relation; he must have been employed to negotiate the contract or transaction in connection with which his services were rendered; and the employment must have been by the person from whom the commission is claimed or by some one acting for him. Where there is no employment or binding contract for the payment of commissions and the broker acts as a mere volunteer, he is not entitled to compensation for his services, although such services are the efficient cause of bringing the parties together and result in a sale or other contract between them."

The case of *Patee v. Moody*, 166 Kan. 198, 199 P. 2d 798, involved a real estate broker who claimed a commission upon facts which now appear stronger than the evidence in the case at bar. Yet, this court in the Patee case reversed the trial court and sustained a demurrer to plaintiff's evidence. In the Patee case this court said:

"There is no evidence and no contention that prior to the Saturday night telephone conversation Moody had listed his property with Patee or had in any way made Patee his agent. All negotiations by Patee had been exclusively as the agent of Welch. Patee had advertised the Welch property and as a result Moody went to see Patee about buying the Welch property. All conversations about the Moody property related to the question whether Welch would consider taking it in as a part of the deal for disposing of his property. Welch had objected to paying a commission to Patee on the full amount of the deal in case he took the Moody property as part payment. This was a matter entirely between Welch and Patee. On the Saturday evening Moody called Patee to ask him if Welch would consider taking the Moody property in on a trade. Patee—speaking as an agent of Welch—replied that he would and had already offered to take it in at $7,500. Moody wanted to know if he could talk to Welch about a trade. Patee replied that he was leaving in the morning and would call Welch and find out if he would care to talk to him. We think it clear that in finding out whether Welch would care to talk to Moody, Patee was still acting as the agent of Welch. Then Patee told Moody that if they made a trade Welch would not pay the full commission and

that Moody would have to pay part of it. Moody inquired and was advised as to the amount of the commission. Moody replied 'go ahead and see if I can see Mr. Welch.' From this answer, it is contended that Moody made Patee his agent in the sale or trade of the Moody property to Welch, and agreed to pay part of the commission in case he and Welch came to terms. We think this falls short of the certainty necessary in establishing a binding contract. All that Moody said was that Patee, who throughout all prior negotiations had been acting solely as the agent of Welch, could go ahead and see if he could see Welch. Moody said nothing about paying the commission. He did not authorize Patee to represent him in a trade with Welch. He only said that Patee could see if he could see Welch. Where was there any consideration in that? He could have seen Welch without any call by Patee. If Patee had an intention of holding Moody to a contract of employment, he should have had something more definite than his own inference that Moody was agreeing to employ him and pay a commission simply because he did not say he would not do so. It is not contended that Patee had thereafter any connection with the negotiations between Moody and Welch or was in any way instrumental in closing the deal. Real-estate broker contracts are to be treated the same as any other contracts—that, and nothing more. There must be a meeting of the minds, consideration, mutuality, certainty. We are not willing to say that the evidence here was sufficient to establish a binding contract between Moody and Patee. To do so would make it possible for a broker, upon the merest assumption of consent, to show a binding contract of employment."

Another informative opinion is found in *Zeligson v. Hartman-Blair, Inc.*, 135 F. 2d 874, in which Judge Huxman was the author of the opinion of the 10th circuit court of appeals. Judge Huxman said in part:

"It is a well settled principle of law, which needs no citation of authority to support it, that where an owner, in response to an inquiry from a broker, merely states the terms upon which he is willing to sell his property, he does not become liable for a commission if the broker produces a purchaser. Under such circumstances, the broker is a mere volunteer and the owner owes him no duty whatsoever."

It may be noted that the plaintiff testified in this case he had never had a brokerage contract with Mr. Pozez. Yet on July 7, 1959, shortly before bringing this action plaintiff wrote a letter to Mr. Pozez which he sent by registered mail making a claim on Pozez for the same commission as he now brings suit for against defendant. Was plaintiff in doubt himself as to whom he represented in this supposed deal?

Defendant raised this claim against Pozez in his demurrer to the evidence by claiming that plaintiff represented opposing parties in the transaction without advising them of that fact, see 12 C. J. S. Brokers § 43, p. 105.

We only believe plaintiff did not know whether he had a contract with either Pozez or the defendant.

We believe the trial court was correct and the order appealed from is hereby affirmed. It is so ordered.