No. 43,862

D. M. Hiniger, d/b/a Hiniger Real Estate Company, *Appellee,* v. P. S. Judy, *Appellant.*

(398 P. 2d 305)

Opinion filed January 23, 1965.

*Donald C. Little,* of Kansas City, argued the cause and was on the brief for the appellant.

*W. H. Brown,* of Kansas City, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by a real estate broker to recover a broker's commission for the sale of farm real estate. The case was tried before a jury in the district court of Wyandotte County, Kansas, resulting in a verdict and judgment for the plaintiff, whereupon appeal has been duly perfected.

The appellee in his brief says the only question is: "Were plaintiff-appellee's efforts the procuring cause of bringing buyer (Mr. Stoneback) and seller (Mr. Judy) together?" To be more technical, the appellate question is whether there is any evidence to sustain a finding that the efforts of the real estate broker were the procuring cause of the sale.

The general rule is that a real estate agent or broker is entitled to a commission if (*a*) he produces a buyer who is able, ready and willing to purchase upon the proffered terms or upon terms acceptable to the principal; (*b*) he is the efficient and procuring cause of a consummated deal. (*DeYoung v. Reiling,* 165 Kan. 721, 199 P. 2d 492, Syl. ¶ 1; and *Patee v. Moody,* 166 Kan. 198, 199 P. 2d 798.)

In the *DeYoung* case the court said:

"We need not here discuss at length the conditions under which real estate agents or brokers are entitled to a commission. Various aspects of the pertinent law on that subject are treated extensively by the textbook writers—and the cases from which the applicable rules are deduced are legion. It is well, however, to have in mind at the outset some long-established rules. A broker is entitled to a commission if he produces a buyer who is able, willing and ready to purchase upon the proffered terms *or upon terms that are acceptable to the principal.* He must be the 'efficient,' the 'procuring' cause, or as some cases say, the 'proximate' cause, of the consummated deal. An owner who has knowledge that a broker with whom he has listed his property has interested a prospective customer with whom he is still conducting negotiations, cannot defeat the broker's right to a commission by the expedient of closing the deal himself or through another broker. . . . The payment of a commission to one broker is not in itself sufficient to avoid liability to another. . . ." (p. 725.)

It is to be noted the conditions specified in both (*a*) and (*b*) above (*DeYoung v. Reiling,* supra, Syl. ¶ 2) must be met before the real estate broker is entitled to a commission. Numerous cases have been litigated in which the issue is whether the real estate

broker is entitled to a commission upon the sale of real estate, but basically, they do not alter these conditions. Occasionally a case will arise where a departure appears to have been made, but upon careful study the rule was not altered. The factual situation merely necessitated a distinction.

An example is *Owen v. Spangler*, 111 Kan. 484, 207 Pac. 772. There land had been listed on certain terms for sale with a real estate agent. The agent procured a purchaser on terms slightly different and communicated the fact to the owner who, on April 21, telegraphed in reply: "Will take offer and vacate May fifth, sooner if possible." The owner was informed by letter that the terms stated in his telegram were satisfactory to the purchaser, and that there was no need of a written agreement. The purchaser was ready, able and willing to complete the sale; the only reason it fell through was because the owner insisted upon the purchaser signing a written contract, dated about April 27, providing for possession to be given within thirty days from that date, or sooner if possible. The court held the agent had earned his commission when he brought the parties together upon terms agreeable to them, and that the seller could not relieve himself from liability to his agent by insisting upon different terms which prevented a sale.

On these facts the court stated the rule to be:

"Where a real-estate agent is employed to find a purchaser ready, able and willing to buy on terms acceptable to the seller, it is not required in order to earn his commission that he bring the parties together personally or introduce them, nor is it the law that in order to earn his commission he must procure a binding contract signed by the purchaser." Syl. ¶ 1.)

In *Dreisback v. Rollins*, 39 Kan. 268, 18 Pac. 187, approval was given to an instruction of the trial court which reads:

" 'If the defendant placed certain real estate in the hands of the plaintiff, as a real-estate agent, to find him a purchaser, and thereafter plaintiff brought him and his principal into communication, setting on foot negotiations which resulted in a sale, then, notwithstanding the transfer was concluded by the principal, the agent would be entitled to his commission, even though the said principal had placed said real estate in the hands of other agents for sale, and had reserved the right to sell said lands himself. It would not be essential that the agent should be present and participate in the consummation of the sale to be entitled to his commission, unless the terms of the contract between himself and his principal specially provided therefor; . . .' " (p. 269.)

In *Grimes v. Emery*, 92 Kan. 911, 141 Pac. 1002, the court said:

"The appellant contents that under the evidence in this case the appellee did not bring the seller and the purchaser together or institute a contract be-

tween them and hence did not earn any commission. Numerous authorities are cited, the language of which differs mainly upon what constitutes a bringing of the seller and purchaser together or the producing of a purchaser to the seller who is ready, willing and able to purchase the property upon the terms and at a price designated by the owner, but none of them so inconsistent with the general doctrine that where a broker is employed to sell real estate for a commission and by any means is the procuring cause of bringing the seller and a proposed buyer together and a sale is consummated, either with or without the assistance of the broker, the broker is entitled to his commission." (pp. 914, 915.)

In *Marlatt v. Elliott*, 69 Kan. 477, 77 Pac. 104, the court undertook to reconcile apparent variations in the rule by showing that statements relied upon by the defendant were either incomplete quotations from the opinion cited, or that the proposition of law relied upon was a proper pronouncement of the law under the facts of that case.

The primary relation, as between customer and real estate broker, is that of agency, and the general rules of law applicable to principal and agent govern their rights and liabilities. Furthermore, agency can result only from contract, express or implied, and in determining whether a valid contract has been entered into, the rules which pertain to contracts generally are applicable. There must be consideration, mutuality and a meeting of the minds as to essential matters. Meeting of the minds may be shown by implication, by conduct of the parties. Like other features essential to a cause of action, the burden of establishing agency is upon the party asserting it. (*Patee v. Moody*, 166 Kan. 198, 199 P. 2d 798.)

Whether a broker has performed services entitling him to a commission is ordinarily a question of fact for the jury, if there is conflict of evidence or if there is any substantial evidence to support the essential elements of his cause of action. Each case must be determined upon the particular facts presented. Whether the broker was the procuring cause of a purchase must be determined in the light of all the facts and circumstances leading up to and including any final negotiations between the vendor and the purchaser. (*DeYoung v. Reiling*, supra; *Patee v. Moody*, supra; and *Grimes v. Emery*, supra.)

An attempt to determine whether there is any competent evidence to support a finding that the real estate broker was the procuring cause of the sale in this case will require a detailed recital of the facts. It will also serve to give the reader a proper understanding of the case.

Harvey Stoneback was a farmer who sold land which he owned west of Lawrence for a considerable sum of money. Thereafter he desired to buy a Kaw Valley bottom farm and started to look for one personally. He looked on both sides of the Kaw River in the Lawrence area, in the DeSoto area and in the area of Linwood. He personally checked various farms on both sides of the Kaw River. He testified he would find a farm for sale and would stop his automobile along the road.

"Had you looked at the farms from Bonner east to Kansas City in the Kaw Valley?

"A. No, I hadn't come down that far."

Phillip S. Judy (defendant-appellant) was not a farmer but owned a Kaw Valley bottom farm of approximately 200 acres located near Bonner Springs. Judy had gone to D. M. Hiniger, d/b/a Hiniger Real Estate Company (plaintiff-appellee) and said he was going to sell his farm. He informed Hiniger that he had told three or four other brokers about it and that he wanted $120,000 net. He said to Hiniger:

"Don't bring anybody down unless it is somebody that has got enough money to buy it because I don't want them running around over the place." Hiniger testified:

"He told me that he didn't want to write it in a written contract right now, but he said, 'If you find somebody that is capable of buying this place,' he said, 'you let me know and I will sign up a written agreement with you.' "

Into this state of affairs Stoneback on or about the 28th day of March, 1961, wandered into Hiniger's real estate office in Bonner Springs. Stoneback did not talk to Hiniger but to a salesman in Hiniger's office by the name of Tompkins. Stoneback asked if they had any bottom farms for sale. Tompkins said they did not have any, but he showed him a creek bottom farm in Johnson County which Stoneback did not want. This was the only farm Hiniger's real estate firm ever showed to Stoneback.

On Friday, the 21st day of April, 1961, Stoneback again stopped in Hiniger's office and again inquired of Tompkins concerning Kaw Valley bottom farms. Stoneback testified that Mr. Tompkins told him that he had a very good farm, "it would be dandy for me," "a garden spot." Tompkins testified concerning this occasion as follows:

"Q. What if anything did you say to Mr. Stoneback about the Judy farm?

"A. I asked him would he be interested in a Kaw Valley farm of a little over 200 acres, that was good land and lay approximately a little over three

miles from Bonner Springs that would run about $125,000 to $130,000 — will he be interested in that?

"Q. What did he say?

"A. Yes, he said he would.

"Q. When did you say that was?

"A. That would be on Friday, April 21st.

"Q. Did you tell him this was the Judy farm and where it was located?

"A. No.

"Q. Did you describe the farm to him other than generally?

"A. No.

"Q. Did you tell him it was the P. S. Judy farm at Edwardsville, Kansas?

"A. No."

As to this occasion Stoneback testified:

". . . Some way or another he said he knew of one but I don't think he had it listed yet. It was a garden spot.

"Q. And you wanted to see that?

"A. Yes. But no, he wouldn't show it to me.

"Q. Why?

"A. Well, he didn't say why. He just said he couldn't show it to me. I says, 'Well, would you tell me this? Is it above Bonner Springs or below Bonner Springs on the river?' No, he couldn't tell me that either. Well, I got kind of disgusted with them and I says, 'Well, I guess I will go on.'

"Q. Yes?

"A. And I did. And the next day, I guess it was, or soon after that anyway, I come down to Edwardsville and I seen some nice land back in behind Edwardsville, so I drove down 104th Street, which is the main street of Edwardsville where the postoffice is.

. . . . . . . . . . . . . .

"A. So I drove down there, and there was a little house off the road there. It was early in the morning and there was a man there, and I says, 'Do you know if there is any land for sale down here?' And he says, 'Yes, there is two hundred acres right across the road I think is for sale.' And I says, 'Who owns it?' 'Mr. Judy.'

"Q. Prior to that time nobody had mentioned the word Judy to you?

"A. No.

"Q. You never heard the word?

"A. That is the first time, when this man told me.

"Q. That is the man on 104th Street at Edwardsville, Kansas?

"A. Yes.

"Q. He pointed out the Judy farm to you?

"A. Yes.

"Q. What did you do then?

"A. Well, I says, 'Do you know where he lives?' Well, he thinks he lives up there, over on the hill there, but he says, 'They can tell you in Edwardsville where you can get in contact with him.'

.. . . . . . . . . . . . . .

"Q. Did you talk to Mr. Judy?

"A. I think that same day I talked to him.

"Q. What was the conversation you had with him?

"A. I asked him if he owned that farm out there and he still wanted to sell it, I was wanting to buy some land.

"Q. What did he say to you?

"A. He says, 'I sure do.'

"Q. Did you talk price?

"A. I don't believe we did at that time.

"Q. Did he tell you who he had it listed with?

"A. Well, Turner State Bank, a man by the name of Mr. Madden. And he said, 'I just listed it yesterday with Hiniger at Bonner Springs.' That is what he told me.

"Q. All right. When he told you that, what did you say?

"A. What did I do?

"Q. What did you say?

"A. Well. 'I don't want to do business with Hiniger.' That is what it was.

"Q. You declined to do any business through him?

"A. Yes. Yes.

"Q. What did Mr. Judy say then, if anything?

"A. Well, I guess he said he guessed I didn't have to, he had it listed at the Turner State Bank.

"Q. Now, did he say anything to you about offering to show you the property?

"A. Yes, but I believe I said, 'Well, I have already walked all over it.'

"Q. Had you?

"A. Yes, that same morning when that man told me.

"Q. Before you went down to see him you walked all over the farm?

"A. Yes.

"Q. Was anybody with you?

"A. No."

Tompkins said he told Stoneback he intended to get information concerning this farm and suggested that Stoneback come back some three or four days later, but Stoneback never returned.

Tompkins testified that he made an appointment for Stoneback to return to his office on Tuesday, the 24th (sic) day of April, 1961, at 2:30 p.m. Stoneback testified that he never agreed to come back.

As to the occasion in question Mr. Hiniger testified as follows:

"A. It was on the 21st day of April of 1961 that I called Mr. Judy and told him I believed we had a prospective buyer capable of buying this place, and I would like to meet with him and sign the contract that he had agreed to. So he agreed to meet us on the next day, Saturday, at Edwardsville and sign the contract to sell this farm.

"We met with him on the next morning and he wanted to know about the prospect and if he was able to buy, and I told him that Mr. Tompkins, my salesman, had been showing Mr. Stoneback—or I didn't mention his name, but I said, 'We have been showing a prospect a bunch of farms around.' And I said, 'We think that he might buy your place.'

" 'Well,' he says, Judy says, 'does he have enough money to buy?' And I said, 'Yes. I have done what you told me. And I have called a friend of mine in Lawrence and asked him if this fellow is able to buy.' And he said, "yes, I know the fellow very well." He said, "He sold the biggest farm west of Lawrence that is in this area and that ran into quite a sizeable sum of money and he wants to put that money back into a farm somewhere." And I said, 'That is the man we have and I think he is very capable of buying your place.' So Mr. Judy said, 'Well, in that case I will sign the contract.'

"Q. This all took place on April 22, Saturday?

"A. On April 22, on Saturday.

"Q. And it was actually signed on the 22nd but was dated the 21st?

"A. That is right."

It was thus on Saturday, the 22nd day of April, 1961, that Hiniger, by his own admission, first procured a contract to sell the farm owned by Mr. Judy. This was a nonexclusive listing on a form written contract prepared by Hiniger and signed by Judy. Judy had explained to Hiniger that this property was already listed with other brokers and that he would not give an exclusive contract to any real estate agent.

The contract introduced in evidence discloses that the provisions making the contract exclusive were stricken. It was a general real estate broker's "Sales Agency Contract" between the parties listing the farm for a term of six months, in which the owner agreed to pay five percent commission on the sale price of $90,000. The concluding paragraph of the contract reads:

"In the event the property is sold within 30 days after the termination of this Contract, whether directly or indirectly, upon any terms, to anyone to whom it has been offered by the agent, providing he shall have disclosed the name to the owner on or before the terminal date of this Contract, the owner shall pay the agent full commission."

In the course of Hiniger's testimony at the trial counsel for Hiniger stipulated that the Hiniger Real Estate Agency did not show the farm to Stoneback; that Tompkins did not show the farm to Stoneback; that no mention was made of the name of the farm; and that no one told Stoneback where the farm was located, "Only the general direction, three miles from the city limits of Bonner Springs."

Hiniger testified that when he went to talk to Judy to obtain the listing he did not tell Judy that Stoneback was the prospective purchaser he had in mind.

The reason why Mr. Stoneback was not shown the Judy farm by the Hiniger Real Estate Agency on the 21st day of April, 1961, was stated by Hiniger as follows:

".  .  . we didn't have the Judy place under contract and we knew if we explained about a farm or house somewhere that is not under contract and tell a man exactly where it is that we probably will get the run around on a commission. We told him it was within about three miles of Bonner Springs, and some things about the place, but we couldn't tell him all about it."

Throwing further light on the occasion in question, Mr. Stoneback testified on cross examination:

"Q. When he told you there was this two hundred acres of land near Bonner that might be for sale, did you make an appointment to come back after he got all the information on it?

"A. No, I don't think I did, because if I couldn't find out where it was and if they didn't want to sell it and wouldn't let me look at it, that made me a little bit peeved. And I says, 'Well, heck, there is plenty of land in the Kaw Valley. I will look for some myself.' And I accidentally ran onto this place and it happened to be the same place. I didn't know it."

Judy in his testimony confirmed the fact that Hiniger would not tell him who the prospective purchaser was. Judy then testified:

"A day or two after that a Mr. Stoneback came up to me, came to the place and saw me. And he says, 'I have looked over your farm.'

"Q. Did he say he had looked it over or wanted to?

"A. He said, 'there was some people told me about it. I have been looking up and down the valley and some neighbors have told me the farm was for sale.' I said, 'Who are you dealing with?' He says, 'I am not dealing with any real estate men.' I says, 'Mr. Hiniger came down here the other day and I signed a contract. Are you dealing with him?' And he says, 'No, I am not.'

".  .  . I asked him if any real estate man sent him, and he says, 'No, I am not dealing with any real estate men.' I says, 'I signed a contract with Mr. Hiniger day before yesterday to sell this land, and also a Mr. Madden, has a contract to sell this land.' He says, 'I won't deal with Hiniger. He has tried to sell me some old junk land and I won't have anything to do with him. I don't want anything to do with him.'

"And I then called Mr. Hiniger and I says, 'Hiniger, Mr. Stoneback is down here looking at this farm and likes it and I think he is going to buy it. Tomorrow I think I will close the deal. But if you are in on it, you see Mr. Stoneback and bring him down here. You bring him down here, so that there will be no conflict'. I made that emphatic to him. He and his helper then said, 'We will go up this afternoon to Lawrence.' They did. And the next day after that Mr. Stoneback came down and he says 'I don't want to deal with that man and I told you that. I won't buy the farm if you keep on.'

"Well, I told Hiniger, that, and I didn't see anything more of him.

"I says, 'well, how would it do to deal through the bank at Turner? Mr. Madden has been my banker for years and years, and there is a lot of legal work and a lot of stuff to attend to.' Which I don't know. I am an engineer, a well man. 'That is all right.' And he went down there and saw Mr. Madden, and they consummated the deal.

"Then after the contract was drawn up with them, Mr. Hiniger some time after called up and wanted to know about his commission. I says, 'Well,

now, wait a minute. I have paid the commission. I paid the commission, every penny, to Mr. Madden.' I said, 'I am not going to pay it twice. If Mr. Madden wants to surrender part of it—You have done nothing about this sale, not a thing. It is up to you. I am not going to pay this commission unless it is legal and it is necessary to do it.' "

Tompkins testified as to a communication between Judy and the Hiniger Real Estate Agency by telephone on a Tuesday, the 25th day of April, 1961, as follows:

"Q. What was that conversation or when did it take place?

"A. The telephone rang, I was at the office and I answered it Hiniger Real Estate, Tompkins speaking, and Mr. Judy says 'This is Mr. Judy, I believe you folks have sold the farm.' And I said, 'That is to Mr. Stoneback of Lawrence?' and Mr. Judy said 'yes.'

"Mr. Little: Mr. Judy said 'yes' to you?

"The Witness: Yes.

"Q. That was the last conversation you had with Mr. Judy until you met him on the street in May?

"A. Yes."

Later in the day on Tuesday, April 25th, Hiniger called Judy. He testified as follows:

"Q. Mr. Hiniger, when did you next talk to Mr. Judy? This was on a Saturday that you signed the contract, as I understand it?

"A. About noon on the following Tuesday I called Mr. Judy and I said, 'I understand that our man from Lawrence has been down and you have sold the farm.' Mr. Judy said, 'Yes, your man Mr. Stoneback has come down from Lawrence and we have made all the arrangements and he is going to take it.' And I said, 'Well, what do you want me to do? What is the deal on it? Do you want me to help with the abstract and get going on it?' He said, 'Now,' he said, 'Mr. Stoneback is coming in in another few minutes or so.' And he said, 'We have a few particulars to work out on it.' He said, 'If you will stay around the office,' he said, 'I might be calling you.' So I waited around the office that afternoon and there wasn't any call come in. And then the next morning, it was Wednesday morning, Mr. Judy called me and he said, 'Now, your man Mr. Stoneback is going to buy the farm. We have met on all the terms and everything.' He said, 'Has the mail come in?' It was about 9 o'clock. He said, 'I have another offer in the mail.' He said, 'there is a fellow somewhere over in Missouri that sent a $1000 check in the mail.' And he said, 'It is not as good a deal as Mr. Stoneback's. It is not quite the kind of deal I would want, but,' he said, 'I don't want to lose it.' He said, 'I want to sell this farm.' He said, 'what I want you to do is get hold of Stoneback and get him signed up on this deal, and let's close it up.'

. . . . . . . . . . .

"So that evening, Wednesday evening, I told Mr. Tompkins, my salesman, 'We better go to Lawrence and see if we can't find Mr. Stoneback.'

"So we went up to Lawrence and we found where he lived and went down to the place.

. . . . . . . . . . .

"I told him, 'I understood you were making a deal for the Judy place, that it was about what you wanted.' And he said, 'yes, that is right.' . . ."

The substance of what took place when Hiniger and Tompkins called upon Stoneback in Lawrence was that they antagonized Stoneback and he ordered them off the place. Hiniger admits Stoneback refused to deal with him in any way.

The evidence discloses that Stoneback purchased the farm from Judy for the sum of $90,000 and that the negotiations and legal paper work necessary to consummate the deal were handled by Mr. William Madden, Judy's banker, and Judy's attorney. The deal was closed on the 26th day of June, 1961, and Judy paid Madden a commission of $4,500.

For the reasons hereafter assigned, we think there was no competent evidence from which the jury could possibly have found that the Hiniger Real Estate Agency was the procuring cause of the sale.

It has been held where the plaintiff, who is the only witness in his behalf, testifies to a state of facts which precludes his recovery, the effect cannot be avoided, and he is bound thereby. (*Bell v. Johnson*, 142 Kan. 360, 46 P. 2d 886, Syl. ¶ 2.)

In *Blackmore v. Auer*, 187 Kan. 434, 357 P. 2d 765, it was said:

"The vigor of the rule heretofore stated in testing the sufficiency of the evidence on demurrer yields to the impact of admissions made by a party in his testimony while a witness in the case, and such admissions, frequently spoken of as informal admissions, are binding and conclusive upon him if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross examination of the party. . . ." (pp. 441, 442.)

The same principle of law applies in testing the sufficiency of the evidence to support the verdict (See, *Casement v. Gearhart*, 189 Kan. 442, 370 P. 2d 95) where such issue is clearly presented without complicating factors. The proposition of law which evolves may therefore be stated as follows: A verdict cannot be upset if there is any evidence in the record to support it, where such issue is clearly presented without complicating factors, but such rule yields to the impact of admissions made by a party in his testimony while a witness in the case, and such admissions are binding and conclusive upon him if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross examination of the party.

It has been recognized that admissions made by a party are the strongest kind of evidence.

Here numerous admissions were made by Hiniger in his testimony which are binding and conclusive upon him. Such admissions were not contradicted and the explanations given did not in any way detract from their binding effect and conclusiveness.

In the instant case on the vital point at issue there was no contradictory nor conflicting testimony from which the jury could possibly have found that the Hiniger Real Estate Agency was the procuring cause of the sale. Both Mr. Hiniger and his only other witness, Tompkins, testified in substance that they did not intend and never intended that the prospective purchaser should view or see the Judy farm until after they had obtained a contract to sell it to him. They both admit that Stoneback, who bought the farm, saw and found the farm before they were in a safe position to show it to him or tell him where it was located. This evidence by which Hiniger is bound established that the broker did not produce the customer, but instead the customer produced and offered himself to the seller before the broker could do so.

The general rule is that a real estate broker is entitled to a commission if ($a$) he produces a buyer who is able, ready and willing to purchase upon the proffered terms or upon terms acceptable to the principal; ($b$) he is the efficient and procuring cause of a consummated deal. The broker can recover a commission only if he sustains the burden of proving that he has fulfilled each of these conditions.

The contention of Hiniger in his brief, that his agency brought the Judy farm to Stoneback's attention and intended to do so by telling him it was three miles from Bonner Springs, is contrary to the reason given by Hiniger for not disclosing more information to Stoneback concerning the Judy farm. The only testimony on this point was given by Tompkins who said he told Stoneback the land "lay approximately a little over three miles from Bonner Springs." In talk by a real estate agent this could hardly be said to describe the location of the Judy farm.

It has been held where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground and put his conduct on another and different consideration. He is not permitted thus to mend his hold; he is estopped from doing it by a settled principle of law. (*Redinger v. Jones,* 68 Kan. 627, 637, 75 Pac. 997; and *Sandefur v. Hines,* 69 Kan. 168, 171, 76 Pac. 444.)

Where one gives a real estate broker authority to sell his property upon terms stated but not expressly agreeing that such real estate agent shall have the exclusive right to sell, he retains the right to effect a sale personally or through another agent. (See, *Krehbiel v. Milford*, 171 Kan. 302, 232, P. 2d 229.)

We hold where a real estate broker merely tells a prospective purchaser that there is a farm in a certain general area or vicinity for sale, before the broker procures a contact from the owner listing such farm for sale, and does nothing more to bring the buyer and the seller together, as here, it is insufficient to show a service rendered by the real estate broker which would entitle him to claim that he was the procuring cause of a sale made by the owner.

After Stoneback found the Judy farm by his own efforts and presented himself to Judy, he indicated a willingness to buy the Judy farm. Up to this point neither Hiniger nor his salesman, Tompkins, had anything to do with the deal which would authorize them to a commission for the sale of the farm. At this point Judy called Hiniger and said: "what I want you to do is get hold of Stoneback and get him signed up on this deal, and let's close it up."

Judy was willing to pay one commission for the sale of his farm but not two. He did not want to handle the final negotiations or be concerned with the legal papers closing the transaction. It was a big deal for him and he wanted everything to be handled properly by someone who knew how to handle it.

Therefore, Judy gave Hiniger an opportunity to earn a commission by closing the deal. This was a new oral contract independent of the original contract listing the farm for sale. If Hiniger could get Stoneback signed up and close the deal, Judy would pay him a regular commission. But the efforts of Hiniger antagonized Stoneback and he refused to deal with Hiniger in any way. Thus, on this subsequent independent contract Hiniger failed to produce.

Hiniger contends in his brief that Judy admitted he owed a real estate commission to him. In view of the factual situation as it arose in this case, it becomes necessary to consider this point. Mr. Hiniger testified:

"Q. When did you next talk to Mr. Judy?

"A. I called Mr. Judy the next morning early, Thursday morning [April 27, 1961], and I told him that we had been up to Lawrence to see the man, as he had told us to do, and that Mr. Stoneback said he wouldn't sign up with us, that he was going to deal direct with Judy. So, Judy said, 'well,' he said, 'I will tell you, you produced this prospect, and,' he said, 'If he buys the farm

you are going to get paid this commission.' I said, 'I know you and I have had a lot of dealings together and I know you are honest and fair about it, and that is the way we have always done business, and I will expect a commission.' He said, 'what do I do from here?' I said, 'I will draw the contract up and give it to you and you could sign it up, perhaps.' He said, 'Well,' he said, 'I don't know whether it ought to have a witness or somebody here.' He said, 'I would like to have you fellows or somebody else because it is a big deal and I don't want to lose out. I have another man on it.' So I suggested that he probably then ought to see his attorney if he had some business with an attorney, and he said he did. And he decided at that time that he would take it up with his attorney. And he wanted to know of me when Mr. Stoneback was coming down and I said, 'Well, he talked like he will be in today.'

"Q. When did you next talk to Judy about the transaction?

"A. That was on a Thursday, and I waited on a call on Friday. And it seemed like I couldn't get hold of Judy Saturday or Sunday. I think it was the following Monday I called Judy to see if the deal was closed. Judy said, 'I took it to the attorney,' and, he said, 'we have got it all wound up.' He said, 'Don't you worry, Hiniger, that commission is due you, we arranged for it, and you will get paid.' "

Mr. Judy in his testimony denied that he had any time acknowledged owing Hiniger a real estate commission.

Hiniger in this case seeks to recover a real estate commission on the basis of the written nonexclusive real estate sales contract which he had with Judy. Construing the testimony of Hiniger, wherein he contends Judy admitted owing a commission, most favorably to Hiniger, it still does not support the verdict of the jury. In the first place, it is absolutely contrary to the admissions made by Hiniger at the trial and to the stipulations which he entered into. They established that neither he nor his agency was the procuring cause of the sale. The admissions Hiniger contends Judy made to him do not explain Hiniger's conduct and admissions to the contrary. (*Blackmore v. Auer*, supra.) In the second place, if such testimony of Hiniger be construed as a promise by Judy to pay a broker's commission to Hiniger, it is not supported by any consideration and therefore not binding on Judy. In the third place, this point is not embraced within the only question stated by the appellee to be the issue on appeal.

We hold upon all the facts, conditions and circumstances presented by the record in the instant case that there is no competent evidence to support the verdict of the jury. Accordingly, the judgment of the lower court is reversed with directions to enter judgment for the defendant below.

Robb, J., dissents.