# STONE et al. v. COFFMAN.—232 S. W. (2d) 555.

Eastern Section.   March 14, 1950.

Petition for Certiorari denied by Supreme Court, June 9, 1950.

Wm. B. Ladd, of Kingston, Thos. F. Guthrie, of Dayton, for complainants.

Walter H. Cheers, of Dayton, for defendant.

HOWARD, J. Complainants, as real estate brokers, filed this suit to recover $1,000.00 alleged to have been earned by them as a commission for the sale of defendant's farm in Meigs County, Tennessee. The Chancellor found the determinative factual issues against the complainants, and dismissed their bill. By three assignments of error complainants challenge the accuracy of the Chancellor's findings. At the outset we are met with the statutory presumption of correctness in the Chancellor's findings and decree which requires an affirmance unless we are of the opinion that the evidence preponderates there against. Code Sec. 10622.

On November 13, 1947, defendant Coffman signed an exclusive listing agreement appointing complainants as the exclusive agents to sell his farm for $20,000.00, payable one-half cash and the balance in one and two years. This agreement also authorized the agents to accept a

deposit to be applied on the purchase price of the farm and to execute a binding contract on behalf of defendant. A commission of 5% of the sale price was agreed "in case said property is sold within specified time by agent or any other person or persons". The specified time was "until February 1st, 1948, and thereafter until terminated by owner giving ten days notice in writing."

On January 30, 1948, complainant secured a written contract from one L. D. Blazer to purchase defendant's farm at the price stated in the listing. This sale contract as it is headed was signed by Blazer and by complainant Stone, as agent for defendant. This contract contained a provision that "when first party shall offer or deliver to second party deed free and clear of all encumbrances, . . . the second party shall, within 30 days thereafter, pay for the property $20,000.00 under the following terms:" We find no authority in the original listing for the agents to grant the 30 day period after defendant delivers the deed to his farm or offers to deliver it, within which the down payment was to be made and notes executed for the balance. For this reason alone we think the defendant would have been justified in refusing to go through with the sales contract. McFadden v. Crisler, 141 Tenn. 531, 213 S. W. 912.

Despite this, however, defendant, when notified by complainants that they had found a purchaser for his farm, went immediately to an attorney in Decatur, designated by complainants, to execute a deed to the purchaser. Finding, however, that the cash payment of $10,000.00 was not there, defendant refused to execute the deed. He made three or four additional trips to this attorney's office, each time ready and willing to sign a deed provided the down payment was ready for him, but refusing to

sign a deed and leave it with the attorney in the absence of the down payment.

On February 28, 1948, apparently learning for the first time that the exclusive listing agreement which he had signed contained a provision continuing it after February 1, 1948, until 10 days' notice of termination was given by him, defendant had another attorney in Decatur write complainant Stone a letter at Lenoir City, Tennessee, notifying him that the exclusive listing agreement was being terminated. This attorney, Dud Culvahouse, testified that his wife wrote the letter and defendant testifies that he mailed it promptly after it was written. Complainant Stone, however, denies ever having received the letter and insists that Lenoir City was not his address and defendant knew this. However, there appears in the record a letter from complainant Stone to Honorable D. W. Lillard, Attorney, Decatur, Tennessee, concerning this transaction, and Lenoir City, Tennessee, is typewritten in at the top of the letter, apparently as Stone's address.

Defendant had by this time gotten active himself in effort to sell his farm and had found a prospective purchaser by the name of Norton. On March 12, the cash down payment of $10,000.00 still not having been deposited with Attorney Lillard in Decatur, defendant and Norton went to Roane County to Blazer's home to determine finally whether Blazer intended to go through with the purchase of defendant's farm. There they were told by Blazer that the person who was to purchase his farm had backed out and he, Blazer, would be unable to purchase defendant's farm until he sold his own. Defendant then told Blazer of Norton's interest in defendant's farm and Blazer said he had no objection to defendant selling it to Norton. Thereupon, on the next

day, March 13, 1948, defendant did sell his farm to Norton on the same terms he had been willing to sell to other purchasers, that is $20,000.00, payable $10,000.00 cash and the balance in one and two years. After this sale, complainants demanded that defendant pay them 5% commission, and upon his refusal this suit was brought.

■ Did complainants procure a purchaser ready, willing and able to purchase defendant's farm while the listing agreement was in effect? The Chancellor found they did not, and we concur in his finding. Regarding Blazer's ability and readiness to purchase the farm, he testified in his deposition as follows:

"XQ. 1 At the time you signed this contract, of course, it was with the understanding that you would first have to sell the farm? A. Yes I said I didn't want to have two farms on my hands.

"XQ. 2 And at the time you signed the contract Mr. Sparks was going to take your farm—A. Mr. Sparks come to me and wanted to buy my farm and said he would be back on Wednesday and he backed out then and I told Mr. Stone he had backed out and then on Friday he come up town and—

"XQ. 3 Now at the time you signed this contract Mr. Stone's told you his time was running out? A. Yes.

"XQ. 4 Said it was the last day? A. He said the time was running short.

"XQ. 5 And he wanted you to sign the contract? A. Yes. Mr. Sparks was taking the place at that time but Mr. Sparks backed out but I don't remember the dates.

. . . . . . .

"XQ. 18 At the time Coffman came to see you Sparks had definitely backed out? A. On Wednesday he was to be back to close the trade and on Friday Coffman came.

"XQ. 19   And Sparks didn't come back on Wednesday?
A. No, sir.

"XQ. 20   And you figured the trade was off?   A. Yes
and I saw him on Thursday.   I came up town and met him
and he said I told you a lie didn't I, and I said well it
looks like it and he·said he had decided that he didn't
need a farm.

"XQ. 21   And you didn't want to go in debt personally
for this other farm and have two farms on your hands?

.   .   .   .   .   .   .

"Witness: Mr. Sparks will tell you he did back out.   I
signed the contract and Sparks backed out.   I don't recall
the dates though.

"XQ. 22   But it was on a Friday before a Sunday that
he (referring to Coffman) come and said he had sold to
Norton and that was after he (referring to Sparks) had
backed out?   A. He come on a Friday and asked me if
I still wanted the place and Sparks had backed out and
then he come on a Sunday after the Friday and told me
he had sold; said he didn't want me to sell expecting to
get his place.

"XQ. 23   At the time you·signed that contract, as I
understood, Mr. Blazer to tell what the truth of it is, at
the time you signed the contract and agreed to buy the
Coffman farm you told Mr. Stone that you would have to
sell the farm which you had owned here before you were
obligated to buy this farm down there?'

.   .   .   .   .   .   .

"XQ. 24   What was your understanding at that time?
A. Mr. Sparks told me he would take my place but I
didn't have any money on it but I had his word and I
knew he was honest and thought he was as good as his
word and he was supposed to come back on Wednesday

and he backed out and I told Mr. Stone that I didn't want to go in debt and have two farms on my hands and I didn't have the money until I sold my farm and I told Mr. Coffman that.

.    .    .    .    .    .

"XQ. 26   You told Mr. Stone at the time you signed the contract that as far as going ahead and buying the Coffman farm that you had to sell yours first?   A.   I told him I had to sell mine first."

The law applicable here is stated in 8 American Jurisprudence as follows:

"To entitle a broker to the compensation called for by his contract of employment, he must produce a person who is ready, able and willing both to accept and live up to the terms offered by his principal.   .   .   ." Sec. 174, p. 1090.

".   .   .   The proposed purchaser must have legal capacity to purchase in addition to having sufficient financial ability not only to make the initial payment required to meet the terms of the seller, but also to complete the contract of purchase according to its terms, that is, to meet any deferred payments.   To be able to pay does not simply mean that the purchaser have property upon which he could raise the amount of money necessary.   A proposed purchaser is not able, when he is depending upon third parties who are in no way bound to furnish the funds, to make the purchase."   Sec. 175, p. 1091.   See also, 1 A. L. R. 530; 167 A. L. R. 607; 12 C. J. S., Brokers, Section 85, p. 187; Cheatham v. Yarbrough, 90 Tenn. 77, 15 S. W. 1076; Woodall v. Forster, 91 Tenn. 195, 18 S. W. 241; Miller v. Bacon, 12 Tenn. App. 123.

It is next urged that the Chancellor erred in holding and decreeing that the defendant's letter terminated the

contract. It is argued that this letter was improperly addressed, was never received by complainants, and was insufficient in law to cancel the agreement.

■ We believe that the weight of the evidence on this point is in favor of defendant. Attorney Culvahouse testified that the letter was written in his presence by his wife for defendant, two drafts being made of it before defendant was satisfied with it. Defendant himself then testifies that he posted the letter, properly stamped and addressed to Stone at Lenoir City, Tennessee. Defendant's return address was typed on the outside of the envelope and the letter was never returned to him. The presumption of proper delivery of the letter was not overcome by Stone's negative testimony that the letter was never received by him. Templeton, the other complainant, lived in Lenoir City and was present when Stone testified, does not appear as a witness.

■ Finally it is insisted that the Chancellor erred in decreeing that the sale of the property did not result from complainants' efforts. Disposing of this assignment we think the testimony of Norton, the purchaser of the farm, forecloses this contention against complainants. Norton testified that he never saw Stone until a day or two before the deed was executed and that was after he and defendant had agreed upon the transaction. Furthermore, it appears that the sale to Norton was made more than 10 days after the listing contract was cancelled by the defendant.

After a careful examination of the record, we are unable to say that the preponderance of the evidence is against the findings and the decree of the Chancellor. Therefore, all assignments of error are overruled and the decree will be affirmed at appellants' costs.

McAmis and Hale, JJ., concur.