No. 46,977

CHESTER WINKELMAN, *Appellee,* v. J. R. ALLEN, *Appellant.*

(519 P. 2d 1377)

Opinion filed March 2, 1974.

*Harold K. Greenleaf, Jr.,* of Smith & Greenleaf, of Liberal, argued the cause, and was on the brief for the appellant.

*Ted F. Fay, Jr.,* of Hugoton, argued the cause, and *Bernard E. Nordling,* of Hugoton, and *Leland E. Nordling,* of Hugoton, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by a real estate broker to recover a commission on the ground that he produced a purchaser who was ready, willing and able to purchase the defendant's 9,000 acre South Dakota ranch upon terms previously agreed by the parties, where the owner who had listed the ranch with the broker refused to sign the contract upon tender of the down payment. The case was tried to a jury which returned a verdict for the broker in the sum of $15,000. The defendant has duly perfected an appeal.

The action was defended on the ground that the broker never produced a *qualified* purchaser willing to meet the terms and conditions upon which the owner desired to sell his South Dakota ranch.

Although numerous points are asserted on appeal our decision hinges upon the issue whether the broker produced a *qualified* purchaser.

In the early part of September, 1970, J. R. Allen (defendant-appellant) went to the office of a real estate broker, Chester Winkelman (plaintiff-appellee) and orally listed his South Dakota ranch consisting of approximately 9,000 acres for sale at $40 an acre. The total purchase price at $40 per acre figured $356,800. During the

conversation Winkelman informed Allen his commission would be 5% of the sale price. *Winkelman told the appellant he would find a qualified buyer, which meant "someone able to handle it".* The listing of the real estate was non-exclusive and the listing was not put in writing.

By reasons of Winkelman's efforts to sell the land he found Russell Bird who was interested in the property. Winkelman then consulted with Allen and procured his authorization to show the ranch in South Dakota to Bird. Allen inquired about the prospective purchaser and was told by Mr. Winkelman that *the Bird family* were farmers and they were *one of the most prominent farming families* in southwest Kansas.

Russell Bird testified that he was a resident of Ellington, Missouri, a farmer, 22 years of age and married. He stated his net worth during the months of September and October, 1970, was approximately $6,000, and that he was working for wages at Moscow, Kansas, for $550 per month. He stated for the year 1970 his gross wages totaled $7,158, and for the year of 1969 his gross wages totaled $5,059.

Roger Bird is the brother of Russell. The only thing in the record concerning Roger is that he accompanied Russell and his father to see the South Dakota ranch on the second visit.

Randall Bird is the father of Russell and Roger. Randall testified he farmed approximately 5,000 irrigated acres of land in southwest Kansas, and he was a stockman and owned a feed lot with a 2,000 head capacity.

Throughout the record there is confusion concerning the dates upon which events transpired. The record establishes the South Dakota ranch was shown to Russell Bird sometime during the middle of September 1970, and to Randall Bird, Russell Bird and Roger Bird on the second visit, which apparently occurred September 24, 1970. Mr. Winkelman was the only other person with the Birds on these trips.

When Mr. Winkelman told Mr. Allen the Birds wanted to inspect the South Dakota ranch a second time and sought his permission to view the property, Mr. Winkelman told Mr. Allen that Russell Bird wanted to show the place to his father and brother and that they would be working in a "partnership type thing".

On the return trip from South Dakota on the second occasion, September 25, 1970, Russell Bird offered Mr. Winkelman $320,000

for the South Dakota ranch upon terms discussed during the return trip.

The next day, September 26, 1970, Mr. Winkelman together with with Randall Bird and Russell Bird met with Mr. Allen at his farmyard. *This was the only occasion Allen conferred with the Birds during the entire negotiations.*

Mr. Winkelman testified that it was on or about the evening of the 26th day of September, 1970, that a figure of $340,000 was discussed with Mr. Allen and that Mr. Allen was informed that Mr. Winkelman (the Thunderdbird Agency) "had a check for $1,000.00 as earnest deposit to hold on to it." He then asked Allen "how he wanted it paid and so on and so forth to see if the sale could be worked out."

Mr. Winkelman also testified that on the way back from the second trip to South Dakota, on or about October 6, 1970, Russell Bird made an offer of $320,000 with $20,000 down and the purchaser to make payments in an amount sufficient to meet the Prudential Insurance Company mortgage payments, and to pay Mr. Allen $5,000 per year on his equity, plus interest on the unpaid portion of his equity, for ten years with the balance due and payable at that time. This offer was made after Russell conferred with his father and brother on the way back from South Dakota.

Prior to Mr. Winkelman taking the Birds to South Dakota on the second occasion he had consulted with Mr. Allen and had his own attorney prepare a contract which is marked defendant's Exhibit No. 1. This exhibit is a typewritten contract of sale. It has a blank space for the date, a blank space for the description of the real estate and blank spaces in the paragraph providing for the terms of payment of the remaining balance of $300,000. The significance of this exhibit is that the seller is described as J. R. Allen and the buyers are collectively described as "BELLA FOURCHE RANCH, INC., (a corporation to be formed)". At the end of this typewritten contract of sale is a blank space for the seller's signature *and three blank spaces for the signatures of the buyers* followed by "BELLA FOURCHE RANCH, INC." with a blank space for the signature of the one signing for the corporation to be formed.

The purchase price recited in defendant's Exhibit No. 1 is $320,000, to be paid in the following manner:

\* \* \* \* \*

"a. Down payment of Twenty Thousand Dollars ($20,000.00), of which One Thousand Dollars ($1,000.00) receipt of which is hereby acknowledged,

shall be deposited with Thunderbird Agency Trust Account, Agent for SELLER, as earnest money, and Nineteen Thousand Dollars ($19,000.00) shall be paid upon approval of title or possession date whichever comes first.

"b. The remaining balance of Three Hundred Thousand Dollars ($300,-000.00) to be paid—etc etc. . . ."

In the blank space following is written in pen:

"$9,500.00 principal per year ($4,500 Ins. $5,000 Allen) plus int. of 6% on unpaid balance to Allen and 7½% int on unpaid balance to Prudential Ins. Co. not to exceed 10 yrs to Allen, at which time entire balance to him to be paid and Ins. Co. Loan to be assumed."

The mortgage carried by the Prudential Insurance Company on the ranch was indicated in the record to be $151,000. This indebtedness was to be paid at the rate of $4,500 principal per year and 7½% interest on the unpaid balance.

Mr. Winkelman testified the defendant's Exhibit No. 1 is the only contract of sale document that he ever discussed with Mr. Allen.

When the reduced price was discussed by Mr. Winkelman with Mr. Allen he told Allen his commission would be $15,000. Allen would not agree to the payment of this sum out of the $20,000 down payment, and Mr. Winkelman finally said he would take $10,000. The matter was left open when Mr. Allen said the payment could be negotiated later.

At the beginning of the farmyard meeting on the 26th day of September, 1970, Mr. Allen assumed he was dealing with a qualified purchaser—namely, Randall Bird and his son. It was at this meeting Randall Bird informed Mr. Allen he was not going to sign the contract with his son Russell. James Cook, president of the Peoples National Bank, Liberal, Kansas, testified he had advised Randall Bird not to sign a contract of purchase for the South Dakota ranch because he did not believe it would be advisable to have a contingent liability. This statement was made by Cook after he testified concerning a consultation with Russell Bird and Randall Bird, wherein he gave a verbal commitment to Russell Bird of $20,000 as the down payment for the purchase of the South Dakota ranch, upon the condition that Randall Bird would sign a continuing guarantee for Russell's indebtedness to the bank.

At the farmyard meeting on the 26th day of September, 1970, Winkelman testified he told Allen that Russell Bird was tendering an offer to buy the ranch for $320,000, with $20,000 down on the terms previously indicated. Allen, having been informed that Ran-

dall Bird was not going to sign the contract, said to Russell Bird, "Boy, I don't think you can make it". Thereafter Russell Bird replied that he believed that he could "make it". Conversation and negotiations continued for some period of time that afternoon. Indications in the record are that the parties were at the Allen farmyard from one and one-half to two and one-half hours. When Mr. Allen was asked in the course of these negotiations whether there were any terms in the contract which he wanted changed, he replied that he would prefer to receive 5% of the unpaid balance on his equity each year plus interest. Russell Bird was receptive to this change. According to Mr. Winkelman the parties did not discuss the total price, the payment of the mortgage or the down payment at the farmyard meeting of September 26th. When asked what Mr. Allen said, if anything, after Russell Bird agreed to accept the proposed change Mr. Winkelman answered, "He just sort of nodded his head and said 'Okay, or yeah', Okay was the word I think he used."

Thereafter Mr. Winkelman had a new contract prepared by an attorney which incorporated the change. This contract is marked plaintiff's Exhibit No. 3 and was prepared by the law firm of Smith and Greenleaf. Mr. Winkelman testified this contract was taken to Allen's farm and given to a woman believed to be one of Mr. Allen's daughters with the request to give the contract to Mr. Allen. Mr. Winkelman does not know for certain whether the contract was actually received by Mr. Allen. Mr. Allen testified that he did not receive the contract and knew nothing of it.

Subsequently Mr. Winkelman contacted Mr. Allen on several occasions to ascertain whether everything in the contract met with his approval. According to Mr. Winkelman's testimony the appellant always replied that he had not had a chance to examine it. Mr. Winkelman believed that in the middle or latter part of October 1970, Mr. Allen became reluctant to go ahead with the sale and began to hedge.

Mr. Winkelman testified that in the latter part of October 1970, he had a telephone conversation with Mr. Allen concerning a four-wheel drive vehicle being used on Mr. Allen's Kansas farm, when the parties had agreed it was to go with the South Dakota ranch. Mr. Allen replied that the truck was still his until he sold the ranch and he could do what he wanted with it until that time. Mr. Winkelman testified that he asked Mr. Allen, "is the deal still on?" and Mr. Allen reassured him that it was and not to worry.

Mr. Winkelman learned on the 16th day of November, 1970, that Mr. Allen had sold his South Dakota ranch to a Mr. Koebler from Lincoln, Nebraska, for the sum of $40 per acre. Thereafter, Mr. Winkelman on the 18th day of November, 1970, had Russell Bird execute a purchase contract (plaintiff's Exhibit No. 3) by signing it, which contained all of the terms claimed by Mr. Winkelman to have been agreed upon by the parties. At the same time Russell Bird made a $19,000 check payable to the Thunderbird Agency as the balance of the down payment on the ranch. Both the contract and this check were given to Mr. Winkelman, who was holding the $1,000 earnest money check made payable to the Thunderbird Agency. On the same day Russell Bird and Mr. Winkelman went to Allen's farm and talked with him in the field where he was working cattle. Mr. Winkelman approached Mr. Allen and advised him that he had an executed contract, a buyer (Russell Bird) and the down payment. He then asked Mr. Allen to sign the contract, and Mr. Allen refused.

Mr. Allen testified Mr. Koebler agreed to purchase the ranch by contract dated October 1, 1970, and executed on October 5, 1970, for the sale price of $356,920.

Two days thereafter, on November 20, 1970, Mr. Winkelman filed suit against Mr. Allen for his commission.

Subsequently, Russell Bird also filed suit against Mr. Allen for damages. An effort to have these two actions consolidated was denied by the trial court.

There is sharp conflict in the testimony between Mr. Winkelman and Russell Bird on the one hand, and Mr. Allen on the other, concerning whether the parties had agreed upon the terms of sale. The record indicates various matters included in the written contracts were never the subject of testimony by the witnesses at the trial. The only place these terms are found is in the typewritten contracts introduced at the trial. For example, plaintiff's Exhibit No. 3 includes two tractors which are described in detail, a two-wheel trailer with stockrack, a working chute, and a 1963 IHC four-wheel drive pickup. There is nothing in the record to indicate any discussion concerning this personal property other than the broad statement of Russell Bird that "certain personal property" was to go with the sale of the South Dakota ranch, and in particular a 1963 International four-wheel drive pickup.

The discrepancies in the tetstimony were all submitted to the jury

and resolved against Mr. Allen, and for purposes of this appeal it is unnecessary to devote further attention to them.

The general rule is that a real estate agent or broker is entitled to a commission if (*a*) he produces a buyer who is able, ready and willing to purchase upon the proffered terms or upon terms acceptable to the principal; (*b*) he is the efficient and procuring cause of a consummated deal. (*DeYoung v. Reiling,* 165 Kan. 721, 199 P. 2d 492, Syl. ¶ 1; *Patee v. Moody,* 166 Kan. 198, 199 P. 2d 798; and *Hiniger v. Judy,* 194 Kan. 155, 398 P. 2d 305.)

In *Hiniger v. Judy,* supra, it was said that the conditions specified in both (*a*) and (*b*) above must be met before the real estate broker is entitled to a commission. The condition specified in (*b*), however, is subject to a qualification where failure in completion of the contract, or closing title, results from the wrongful act or interference of the seller. (*Ellsworth Dobbs, Inc. v. Johnson,* 50 N. J. 528, 236 A. 2d 843, 30 A. L. R. 3d 1370 [1967].)

We are not concerned on this appeal with a discussion of the appellant's rights to sell his property through another broker, where a non-exclusive listing of the property is given, because the trial court instructed on these matters without objection as follows:

\* \* \* \* \*

"Instruction No. 4

"If the Defendant prior to the Plaintiff's notifying him that he had a purchaser ready, able and willing to buy, in good faith sold the land to another customer, the Plaintiff cannot recover. In order for the Plaintiff to recover, the burden is upon him to prove that he obtained a customer who was ready, able and willing to meet the terms offered by the Defendant prior to the sale of the land to another, and so notified the Defendant of that fact. One giving a real estate broker authority to sell his property upon terms stated, but not expressly agreeing that such real estate agent shall have the exclusive right to sell, retains the right to effect a sale personally or through another agent, and the owner may enter into an agreement to sell which will be effectual at any time before he has actual notice that a purchaser has been procured who is ready, able and willing to purchase under the terms of the listing.

"Instruction No. 5

"If you find that the Plaintiff produced a ready willing and able purchaser upon terms acceptable to Defendant, then you must return a verdict in favor of the Plaintiff in the amount of commission agreed by the parties.

"If you find that the Plaintiff did not produce an able, ready or willing buyer or that the terms of the sale were not agreed to by said buyer and the Defendant, then you must find for the Defendant."

By giving credence to the findings of the jury relative to the conflict in the testimony, we must direct our attention on appeal to whether Mr. Allen's refusal to execute the contract with Russell Bird was the result of Mr. Allen's wrongful act or interference. This leads us directly to a consideration of whether Russell Bird was a qualified purchaser—the point upon which the seller, Mr. Allen, sought to defend in this action.

The term "able" in the general rule that entitles a real estate agent or broker to a commission, if he produces a buyer who is able, ready and willing to purchase upon the proffered terms or upon terms acceptable to the principal, in the context of the rule means more than mere mental competence to make a contract or physical ability to sign it. We have been cited to no Kansas cases dealing with the subject and our research on the point has been unavailing. We therefore must resort to decisions from other jurisdictions to analyze the point. This situation is brought about probably because it was so plain that financial capacity was the primary ingredient of the word. Our opinions appear to have given no consideration to the matter of the buyer's financial ability to complete the transaction by paying the agreed price and taking title to the premises. Nothing has been said specifically as to whether it is any part of the broker's obligation to present a financially capable buyer, nor has anything been said that by producing the buyer the broker impliedly represented he was able, in the financial sense, to perform.

Many jurisdictions leave no doubt that "able" refers to the financial ability of the broker-produced purchaser to complete the transaction. In cases where the broker sued the owner for commission because of alleged unreasonable refusal to enter into a contract of sale with the proffered willing and able customer, it was held that as a condition precedent to recovery, the broker was required to establish that his customer was financially able not only to make the initial payment required on execution of the contract, but also to have available the requisite funds to complete the undertaking at the time fixed for performance. (*Ellsworth Dobbs, Inc. v. Johnson*, supra, and the many authorities cited therein.)

The ability to buy refers to the financial ability of the purchaser. A prospective buyer meets the legal standard of "ready, willing and able" to buy, although he does not have the cash in hand, if he is able to command the necessary funds to complete the purchase within the time allowed by the offer. (*C. O. Frick Co. v. Baetzel*,

71 Ohio App. 301, 47 N. E. 2d 1019 [1942]; and *Walton v. Hudson,* 82 Ohio App. 330, 79 N. E. 2d 921 [1947].) While the authorities are not in agreement as to the degree of proof required to show financial ability to pay, most authorities do not require the purchaser to have in his possession the funds necessary to close the deal at the time the contract is entered into. But it must be shown that the purchaser is able to *command* the necessary funds to close the deal on the date agreed upon. (*Walton v. Hudson,* supra.) The term command is important. The word command means "To have control of" (Webster's International Dictionary 2d Ed.). The cases uniformly hold that the purchaser cannot show ability by depending upon third persons in no way bound to furnish the funds. (*Welch v. New York, C. & ST. L. R. CO.,* 5 Ill. App. 2d 568, 126 N. E. 2d 165.)

A purchaser without the ability to finance the purchase is no purchaser at all. Where the only available source from which the greater part of the money is to come to make the purchase possible is, to knowledge of the broker, admittedly in the ownership and possession of a third person, and its use in the interest of the purchaser is subject to the gratuitous consent of such third person who is in no way bound by or a party to the purchase agreement, such a purchaser cannot be considered one able to buy the principal's property. Such funds cannot be considered assets of the purchaser. (*McGarry v. McCrone,* 97 Ohio App. 543, 118 N. E. 2d 195; *Morere v. Dixon Real Estate Co.,* 188 So. 2d 623 [La. App. 1966], and the many authorities cited therein; and *DeHarpport v. Green,* 215 Or. 281, 333 P. 2d 900 [1959].)

An excellent discussion of the purchaser's financial ability to buy in connection with a real estate transaction is made by the Supreme Court of Minnesota in *Shell Oil Co. v. Kapler,* 235 Minn. 292, 50 N. W. 2d 707 (1951), where the court said:

\* \* \* \* \*

"Rules for testing a purchaser's financial ability to buy are not to be reduced to any unyielding formula, but must be flexible enough to accomplish their purpose according to the particular facts of each case. In ascertaining the rules reflected by an endless variety of cases, it is particularly important to bear in mind that no decision is authoritative beyond the scope of its controlling facts. Difficulty in both stating and applying the rules stems principally from a failure to keep in mind that *their purpose*—the protection of good-faith sellers as well as of bona fide purchasers, brokers, and other persons similarly situated—*is to establish a purchaser's financial ability to buy with reasonable certainty.* A purchaser may not have the necessary cash in hand, but that alone, it is rec-

ognized, does not disqualify him if he is otherwise so situated that he is reasonably able *to command the requisite cash at the required time.* On the other hand, the seller is not required to part with his property to a purchaser whose financial ability rests upon nothing more than shoestring speculation or upon attractive probabilities which fall short of reasonable certainty. In short, the rules are designed to protect the seller by binding him to a sale only where there is a reasonable certainty of the purchaser's financial ability to pay and, on the other hand, to protect the purchaser—and persons similarly situated— from a technical, insubstantial, or sharp-dealing disqualification.

"2-3. Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he *is personally possessed of* assets—which in part may consist of the property to be purchased—and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time, or (3) if he has definitely arranged to raise the necessary money—or as much thereof as he is unable to supply personally—by obtaining a *binding commitment* for a loan to him for that purpose *by a financially able third party,* irrespective of whether such loan be secured in part by the property to be purchased. Although no precise line of demarcation between the application of the second and third divisions of the above rule can be laid down for all cases, it is clear—in the light of the purpose of the rule—that where the purchaser relies primarily, not upon his own personal assets, but upon the proceeds of a contemplated loan or loans to me made to him by a third party, he is financially able to buy *only* if he has a *definite and binding commitment* from such third-party loaner. Even though the third party is financially able, his promise is of no avail unless made for an adequate consideration. A purchaser who personally has little, if any, cash or other assets must establish that the financial crutches to be loaned him by others are both legally and financially dependable." (pp. 297, 298, 299.)

In *Potter v. Ridge Realty Corporation,* 28 Conn. Supp. 304, 259 A. 2d 758 (1969) the purchaser was solely dependent upon third persons who were in no way bound to furnish him funds to qualify as an able purchaser. There the court said that even if the parents of the purchaser's wife had in fact been shown to have had funds available to take over and assist in the transaction, entirely or a necessary part, the purchaser *still would not qualify for the status* of an "able" purchaser within the meaning of the rule.

Turning now to the facts in the instant case, it was established by the testimony of Russell Bird himself that the two checks given by him to the Thunderbird Agency (the $1,000 earnest money check and the $19,000 check for the balance of the down payment) at the time they were tendered by the appellee to the appellant on November 18, 1970, were not covered by funds on deposit in the bank upon which they were drawn. In other words, the clearance of these checks through the bank was dependent upon further action by Randall Bird, the father of Russell Bird, to guarantee and

cosign the notes of Russell for the loans at the Plains State Bank upon which they were drawn. Arrangements had previously been made at the Plains State Bank in Plains, Kansas, where the cashier, Mr. Bender, had "tentatively agreed" to make a loan for the down payment in the amount of $20,000, and similarly the bank had "tentatively agreed" to see Russell Bird through the first year and loan him approximately $8,000 for living expenses. At the time of the tender to the appellant no legally binding commitment had been made by either Russell Bird or Randall Bird at the Plains' State Bank for the money to cover these checks.

Analyzing the terms of the contract set forth in plaintiff's Exhibit No. 3, Russell Bird was obligated to pay on the Prudential Insurance Company of America's first mortgage, in the amount of $151,000, $4,500 principal per year plus interest in the amount of 7½% on the unpaid balance. On the $149,000 balance due to the appellant Russell Bird would be obligated the first year to pay $8,940 interest and $7,450 principal. The grand total of fixed obligations due under the contract of purchase for the first year, therefore, would be $32,215, in addition to the $20,000 down payment Russell Bird was obligated to borrow, and for which he had no binding commitment.

The testimony was that 1,700 head of cattle would be put on the South Dakota ranch after its purchase. If Russell Bird were to purchase these cattle, presumably stocker cattle, they would in all likelihood cost a minimum of approximately $200 per head, for a total of $340,000. All of this would have to be borrowed capital. If this court could take judicial notice of interest rates for the year of 1971, the interest rate would exceed 8% on $340,000.

It is to be noted the contract of sale, marked defendant's Exhibit No. 1, had penned notations with respect to the payment of the remaining balance of $300,000, indicating that the Prudential Insurance Company mortgage *would not be assumed by the buyer until after the payment of the first ten annual installments were paid to the appellant.* This was the only written document admitted by the appellee to have been discussed with the appellant.

In the appellant's attempt to defend this action on the ground that Russell Bird was not a qualified purchaser, he was asked by his counsel on direct examination whether he considered Russell Bird, the son, as a qualified buyer. Opposing counsel objected to such testimony on the ground that it invaded the province of the

jury, and the trial court sustained the objection, thereby precluding the appellant from testifying on the subject. This was highly prejudicial to the appellant in the trial of this lawsuit.

Similarly the appellant's expert witness, Mr. Richard Wood of Erie, Kansas, president of the Kansas Association of Realtors, at the last minute could not be present for trial. The weather had closed in and made travel to the place of trial either by road or air impossible. The appellant's counsel by motion requested a one day continuance which the trial court denied. The appellant's counsel then requested sufficient time to prepare an affidavit as to the testimony of his absent expert witness as required by K. S. A. 60-240 ( c ). This motion was presented on the last day of trial after the appellee had presented his evidence and there was no opportunity to prepare the affidavit without leave of court. The trial court denied counsel for the appellant his only opportunity to file an affidavit.

The appellant argues in his brief that it was crucial to his case that expert testimony be presented as to the standards of the real estate industry concerning a "qualified buyer" of both farm and ranch lands. The appellant contended in his petition and it is set forth in the pre-trial order that the prospective purchaser, Russell Bird, a person 22 years of age with a net worth of $6,000 was in no way a qualified buyer. The trial court's denial of the appellant's motion was on the ground that the appellant had not subpoenaed Mr. Wood. Mr. Wood was not a hostile witness but a willing witness who volunteered to come without the issuance of a subpoena. We think this ruling of the trial court further prejudiced the appellant in the trial of this lawsuit.

The foregoing rulings of the trial court substantially eliminated or reduced the effectiveness of the defense that Russell Bird was not a qualified buyer within the standards of the real estate industry, and that he was not considered a qualified buyer at the time by the appellant.

The appellant was also prejudiced when his motion, termed a motion *In Limine,* was overruled. The written contract identified as plaintiff's Exhibit No. 3 was prepared by the law firm of Smith and Greenleaf according to the testimony of the appellee before the jury. This either appeared to the jury, or could have appeared to the jury, that the firm of Smith and Greenleaf, who was representing the appellant at the trial in this case, had prepared the contract as

an attorney for the appellant in the sequence of events. This was not the case. At the time Smith and Greenleaf prepared plaintiff's Exhibit No. 3 they were not aware there was a controversy between Winkelman and Allen or between Allen and Russell Bird. At the time the plaintiff's Exhibit No. 3 was prepared Allen, the appellant, was not represented by counsel. Thus, if it was made to appear to the jury that the appellant had counsel who prepared plaintiff's Exhibit No. 3, the chances of the jury believing the testimony of the appellant were substantially reduced. The appellant's motion was to suppress any and all evidence concerning Winkelman's seeking counsel of the firm of Smith and Greenleaf in the preparation of any agreements or contracts concerning the sale of subject lands. The motion alleged such evidence would be prejudicial and inflammatory to the defense of Mr. Allen. Failure of the trial court to sustain the appellant's motion *In Limine* to avoid giving the jury this impression was prejudicially interjected into a lawsuit. This evidence is made even more prejudicial when Mr. Winkelman testified that a "smooth agreement" was prepared.

It is argued by the appellee that the appellant accepted Russell Bird as a purchaser on the 26th day of September, 1970, at the farmyard meeting between the parties. Therefore, it is argued Russell Bird's qualifications to purchase the ranch and his financial means to do so are immaterial.

The appellee cites no authority whatever for the position taken in his brief that not only was Russell Bird a qualified buyer, but that Mr. Allen accepted him as a qualified buyer.

An analysis of cases from other jurisdictions clearly indicates that the rule regarding the acceptance of a prospective buyer by the owner is undergoing change. The leading case on the subject which has been followed or approved by numerous other jurisdictions in this country is *Ellsworth Dobbs, Inc. v. Johnson,* supra. The New Jersey Supreme Court changed its earlier rule in a well reasoned opinion stating as follows:

"The early cases in our State implicitly imposed on the owner the burden of inquiry or investigation of the financial ability of the person produced as a prospective buyer. They said that if the owner accepted the purchaser brought by the broker and executed a contract to sell to him, that ended the matter as far as the broker's right to commission was concerned. For example, in *Courter v. Lydecker,* 71 *N. J. L.* 511, 513, (*Sup. Ct.* 1904), where the purchaser defaulted and title did not pass, the court held the owner liable for commission saying:

" 'In the present case the broker obtained a purchaser willing to conclude a bargain upon the terms upon which the broker was authorized to sell, *who was acceptable to—for he was accepted by*—the vendor.' (Emphasis ours.) Likewise in *Freeman v. Van Wagenen, supra*, [90 N. J. L. 358 (*Sup. Ct.* 1917)], after referring to the rule that the broker's burden was 'no more than to negotiate a sale by finding a purchaser upon satisfactory terms' the Supreme Court said: 'This the plaintiff did, the defendants actually accepted Scherer as satisfactory.' 90 *N. J. L.*, at *p.* 361.

"Later, more unqualified statements began to appear with respect to the effect on the broker's commission claim of the buyer's inability to complete the contract. It was declared that if the broker in good faith produces a prospective purchaser who is accepted by the seller, and a contract of sale made between the two, the purchaser's ability to perform was no longer open to question. To illustrate, in *Matz v. Bessman*, 1 *N. J. Misc.* 5 (*Sup. Ct.* 1923), the broker produced a buyer who, the court said, was 'plainly satisfactory' because the owner contracted with him. When it developed that the buyer was financially unable to take title, the owner was held responsible for commission because he had 'accepted' the buyer, and 'the broker was not an insurer of either the solvency or the willingness of the customer.'

"In *Brindley v. Brook*, 10 *N. J. Misc.* 612, [160 A. 398] (*Sup. Ct.* 1932) it was said that by contracting with the purchaser presented by the broker, the owner accepted him as satisfactory, and whether the purchaser was able ultimately to comply with the terms of the agreement 'was of no concern' to the broker. He had earned his commission. Thereafter a series of cases projected the rule that once the seller accepted a buyer by entering into a contract of sale, he must be considered to have accepted the financial ability of the buyer to perform, and the broker, who acted in good faith, was entitled to his commission even though the buyer eventually proved to be financially unable to perform; it is immaterial whose fault it was that the final settlement did not take place. *Hatch v. Dayton*, 130 *N. J. L.* 425 (*Sup. Ct.* 1943); *Richard v. Falleti, supra* [13 *N. J. Super.* 534, (*App. Div.* 1951)]; *Winter v. Toldt, supra* [32 *N. J. Super.* 443, (*App. Div.* 1954)]; *Hedden v. Folio, supra* [62 *N. J. Super.* 470, (*App. Div.* 1960)].

"In order to complete the portrayal of the evolution of the current state of the law respecting the right of the real estate broker to commission, it must be noted that all of the cases from *Hinds v. Henry* through *Blau v. Friedman* recognize that by the use of appropriate language the owner-seller, in engaging the broker, may make his liability for commission depend specifically upon the closing of title and receipt by the seller of the consideration. The effectiveness and practicability of this as a safeguard measure for the property owner will be discussed hereafter.

"[1] We pause at this point to explain that a primary reason for granting certification in this case was to reevaluate the justice and propriety of continuing the legal principles outlined above. Is it just to permit a broker to recover commission from an owner simply because he entered into a contract on mutually agreeable terms with a buyer produced by the broker, when it later develops that the buyer cannot or will not complete the transaction by closing the title? We do not think so.

"A new and more realistic approach to the problem is necessary.

"There can be no doubt that ordinarily when an owner of property lists it with a broker for sale, his expectation is that the money for the payment of commission will come out of the proceeds of the sale. He expects that if the broker produces a buyer to whom the owner's terms of sale are satisfactory, and a contract embodying those terms is executed, the buyer will perform *i. e.* he will pay the consideration and accept the deed at the time agreed upon. Considering the realities of the relationship created between owner and broker, that expectation of the owner is a reasonable one, and, in our view, entirely consistent with what should be the expectation of a conscientious broker as to the kind of ready, willing and able purchaser his engagement calls upon him to tender to the owner.

"[2] The present New Jersey rule as exemplified by the cases cited above is deficient as an instrument of justice. It permits a broker to satisfy his obligation to the owner simply by tendering a human being who is physically and mentally capable of agreeing to buy the property on mutually satisfactory terms, so long as the owner enters into a sale contract with such person. The implication of the rule is that the owner has the burden of satisfying himself as to the prospective purchaser's ability, financial or otherwise, to complete the transaction; he cannot rely at all on the fact that the purchaser was produced in good faith by the broker as a person willing and able to buy the property. Once he enters into a contract of sale with the broker's customer, he is considered to have accepted the purchaser as fully capable of the ultimate performance agreed upon. If it later appears that the purchaser is not financially able to close the title, or even that he never did have the means to do so, the owner must pay the broker his commission, so long as he acted in good faith. Such a rule, considered in the context of the real relationship between broker and owner, empties the word 'able' of substantially all of its significant content and imposes an unjust burden on vendors of property. It seems to us that fairness requires that the arrangement between broker and owner be interpreted to mean that the owner hires the broker with the expectation of becoming liable for a commission only in the event a sale of the property is consummated, unless the title does not pass because of the owner's improper or frustrating conduct.

"[3] The principle that binds the seller to pay commission if he signs a contract of sale with the broker's customer, regardless of the customer's financial ability, puts the burden on the wrong shoulders. Since the broker's duty to the owner is to produce a prospective buyer who is financially able to pay the purchase price and take title, a right in the owner to assume such capacity when the broker presents his purchaser ought to be recognized. It follows that the obligation to inquire into the prospect's financial status and to establish his adequacy to fulfill the monetary conditions of the purchase must be regarded logically and sensibly as resting with the broker. Thus when the broker produces his customer, it is only reasonable to hold that the owner may accept him without being obliged to make an independent inquiry into his financial capacity. That right ought not to be taken away from him, nor should he be estopped to assert it, simply because he 'accepted' the buyer, *i. e.*, agreed to convey to him if and when he paid the purchase price according to the terms of the contract. In reason and in justice it must be said that the duty to produce a purchaser able in the financial sense to complete the purchase at the time fixed is an incident of the broker's business; so too, with regard to

any other material condition of the agreement to purchase which is to be performed at the closing. In a practical world, the true test of a willing buyer is not met when he signs an agreement to purchase; it is demonstrated at the time of closing of title, and if he unjustifiably refuses or is unable financially to perform *then*, the broker has not produced a willing buyer.

"A lucid and realistic explanation of the relationship between an intending vendor of real property and the broker appears in the opinion of Denning, L. J. in *Dennis Reed, Ltd. v. Goody*, [1950] 2 *K. B.* 277, *pp.* 284-285, 1 *All Eng. Rep.* (1950) 919, 923:

" 'When a house owner puts his house into the hands of an estate agent, the ordinary understanding is that the agent is only to receive a commission if he succeeds in effecting a sale; but if not, he is entitled to nothing. That has been well understood for the last 100 years or more. * * * The agent in practice takes what is a business risk: he takes on himself the expense of preparing particulars and advertising the property in return for the substantial remuneration—reckoned by a percentage of the price—which he will receive if he succeeds in finding a purchaser. * * * ' " (pp. 545, 546, 547, 548, 549.)

Some jurisdictions have always had the rule announced in *Ellsworth Dobbs, Inc. v. Johnson*, supra. (See Anno. 74 A. L. R. 2d 437, 452.) Other jurisdictions are following New Jersey's lead. Decisions which have either adopted or expressly approved *Ellsworth Dobbs, Inc. v. Johnson*, supra, are: *Setser v. Commonwealth, Inc.*, 256 Or. 11, 470 P. 2d 142 (1970); *Staab v. Messier*, 128 Vt. 380, 264 A. 2d 790 (1970); *Potter v. Ridge Realty Corporation*, supra; *Rogers v. Hendrix*, 92 Idaho 141, 438 P. 2d 653 (1968); and *Mullenger v. Clause*, 178 N. W. 2d 420 (Iowa 1970). For a comprehensive discussion of the New Jersey case see Note, 23 Rutgers L. Rev. 83 (1968); Note, 9 Ariz. L. Rev. 519 (1968); Note, 17 Cath. U. L. Rev. 487 (1968); and Note, 10 Wm. & Mary L. Rev. 240 (1968).

We are persuaded by the cogent reasoning in *Ellsworth Dobbs, Inc. v. Johnson*, supra, and adopt the rules stated in the above quoted portion thereof as the law in Kansas.

On the facts in the instant case the appellant did not sign the contract tendered by the appellee. Factually, therefore, the case presently before us does not involve an executed contract wherein the purchaser subsequently defaults because he is financially unable to perform. But in either situation the broker is obligated to produce a qualified purchaser before he is entitled to a commission. The argument that the appellant "accepted" Russell Bird during the course of negotiations, and in particular on the 26th day of September, 1970, when the appellee claims the appellant accepted him as a purchaser, is not availing to the broker, Mr. Winkelman.

The "acceptance" of Russell Bird by the appellant did not constitute a waiver on the appellant's part of the financial ability of Russell Bird to purchase the property. The burden is upon the appellee, the broker, to show that he has produced an able buyer in the financial sense. Accordingly, the appellant is not estopped to assert in defense of this action that Russell Bird was not a qualified purchaser.

The trial court properly instructed the jury the burden of proof was upon the broker "to prove that he obtained a customer who was ready, able and willing to meet the terms offered by the defendant prior to the sale of the land to another, and so notified the defendant of that fact." The jury was also instructed that if the broker "did not produce an able, ready and willing buyer" the jury must find for the defendant, Mr. Allen. The jury was given no instruction concerning an "acceptance" of the prospective purchaser by the owner.

Mr. Winkelman, the appellee, admitted in his testimony on cross-examination that when the appellant orally listed his South Dakota ranch with him for sale *he agreed to find a qualified buyer, which meant "someone able to handle it."*

Accordingly, under the foregoing rules and upon the record here presented, the appellee did not, as a matter of law, produce a prospective purchaser who was qualified financially to handle the transaction. The appellee by his own evidence on the trial of this action failed in his burden of proof on this point. The trial court should have entered judgment for the defendant, Mr. Allen, on his motion for a directed verdict at the close of the plaintiff's evidence.

In view of the foregoing other points asserted by the appellant in his brief for reversal of the judgment have become immaterial.

The judgment of the lower court is reversed with directions to enter judgment for the appellant, J. R. Allen.

FONTRON, J., concurring: It is my feeling that this case should be returned for a new trial. The evidence, as I view it, presents a question of fact as to whether an able qualified buyer was produced in the person of Russell Bird. My conclusion is based largely on the testimony of James Cook, the president of a Liberal bank, and Randall Bird, Russell's father. Mr. Cook testified he gave Russell a verbal commitment for the $20,000 down payment, while Randall Bird stated on the stand he was going to back his son in the ranching adventure, intended to help him if need be, was willing to co-

sign notes or guarantee notes at the bank, and was planning to put some cattle in South Dakota himself.

In the face of the foregoing evidence I believe the court goes too far in saying that as a matter of law that Mr. Winkelman failed to produce an able or qualified buyer for Mr. Allen's land.

OWSLEY, J., joins in the foregoing concurring opinion.