GATLINBURG REAL ESTATE CO.,
INC., Plaintiff-Appellee,

v.

Maynard and Jeanette BOOTH,
Defendants-Appellants.

Supreme Court of Tennessee,
at Knoxville.

April 25, 1983.

On Petition to Rehear June 6, 1983.

Robert L. Ogle, Jr., Sevierville, for defendants-appellants.

Ronald E. Sharp, Seiverville, for plaintiff-appellee.

## OPINION

DROWOTA, Justice.

The Plaintiff, Gatlinburg Real Estate Co., Inc., filed an action in Chancery Court against the Defendants, Maynard and Jeanette Booth, seeking to recover a commission pursuant to an exclusive listing contract with the Defendants. The complaint alleged that the Plaintiff found prospective buyers for the Defendants' motor lodge, which buyers were ready, willing and able to complete the purchase. After a hearing on the matter, the Chancellor held that the "plaintiff . . . found and produced a purchaser for said property who offered, was able, ready, and willing to accept, buy, and live up to the terms subsequently agreed to and as offered by the defendants" and that the Defendants offered the Plaintiff no reason for rejecting the offer and "failed to establish . . . a valid and legal reason for such rejection." The Court of Appeals, adopting the Chancellor's memorandum

opinion in its entirety, affirmed the judgment. We granted the Defendants' Rule 11 Application so we might review the Chancellor's finding that the buyers were able and his holding that the Defendants failed to establish a "valid and legal reason" for rejecting them.

On January 1, 1979, the Plaintiff and Defendants entered into an exclusive sixty-day agency listing contract for the sale of River Edge Motor Lodge in Gatlinburg, Tennessee. The Defendants are the owners of the motor lodge. The original asking price was $1,300,000, of which Gatlinburg Real Estate Company would receive $100,000 as its commission. The Plaintiff's president, James O. Barnes, contacted William W. Wibbeler, Jr., and Carl E. Garrett of Cincinnati, Ohio, who offered to purchase the motel for $1,215,000. When the Plaintiff refused to lower its commission to $15,000, the Defendants rejected the offer. Apparently, the Booths were determined to receive no less than $1,200,000 for the motel.

Negotiations continued between the parties throughout January and February of 1979. A major concern of the Defendants throughout this period was minimizing the tax consequences of the sale. At one point, a price of $1,280,000 was negotiated (the Plaintiff receiving an $80,000 commission). The Defendants then submitted the contract to their tax accountant. As a result of the accountant's advice, further negotiations followed until the end of February when a final agreement was made for a total purchase price of $1,250,000, of which $50,000 was Plaintiff's commission. The buyers were to make a $295,000 down payment and assume a first mortgage of $390,000 (which had 15½ years left on a 20-year mortgage) and a second mortgage of $565,000 (15–20 years left) held by the Defendants. The buyers planned to set aside a $30,000 cash reserve to provide for debt service during hard times or for improvements. The contract was sent to the Defendants' attorney in Ohio to be "finalized."

During these negotiations, the Defendants, their accountant and their attorney requested that the Plaintiff furnish them with financial information on the buyers. With the exception of statements by Barnes to the Booths and their accountant that the buyers were "strong" and "fine people," no financial information was ever given. Of particular concern to the Defendants was the fact that the contract of sale prepared by the Plaintiff referred to the buyers as "William W. Wibbeler, Jr., and Carl E. Garrett, d/b/a as [sic] a limited partnership." Wibbeler and Garrett had written that they "would be purchasing the property with a small group of investors." Yet no such partnership has been formed in either Ohio or Tennessee. The Defendants were also concerned about the inclusion of a provision in the sale contract for payment of the second mortgage over a thirty-year period and a five to ten year balloon with no prepayment penalty.

On March 6, 1979, the Defendants informed the Plaintiff that they would not conclude the sale. On March 7, the Defendants' attorney wrote the Plaintiff stating the deal was off because of the "out of state limited-partnership, financial conditions contained in the offer, and lack of financial security" of the buyers. This lawsuit followed.

Although numerous errors are asserted on this appeal, we address only the question of whether the Plaintiff performed its duty, under the listing contract, to find and tender a qualified buyer for the Defendants' property. After a careful reading of the record, and giving proper deference to the findings and opinions of the lower courts, we conclude the Plaintiff did not perform its duty under the contract and is not entitled to recover under that contract. Our conclusion is twofold: though we find material evidence to support the lower court's finding that the prospective buyers were able, we think that the Plaintiff's failure to tender adequate assurance of the buyers' financial ability to carry out the terms of the sale contract was sufficient legal justification for the Defendants' refusal to close the deal.

■ The question of whether the buyers proffered by the Plaintiff were able buyers is one of fact. The concurrent finding of the Chancellor and the Court of Appeals on this issue is binding on this Court, therefore, if there is any material evidence to support it. T.C.A. § 27–1–113; *Broyles v. Ford Life Ins. Co.,* 594 S.W.2d 691 (Tenn.1980). The term "able" refers to a buyer's financial ability to make any initial payment required by the terms of the sale contract and also to complete the contract of purchase according to its terms, including the ability to make any deferred payments when due. *Stone v. Coffman,* 33 Tenn.App. 601, 232 S.W.2d 555 (1950); *Winkelman v. Allen,* 214 Kan. 22, 519 P.2d 1377 (Kan.1974). It appears from our review of the record that the Chancellor based his finding on the testimony of James Barnes, the president of the Plaintiff corporation. In his testimony, Barnes stated that, when the Defendants asked him about the buyers' financial standing, "I told them that they [the buyers] were in good shape . . . Anybody that can put $385,000 cash down is pretty potent." It also appears that Barnes' opinion was the result of "60 days negotiations . . . plus the relationship on another deal that I have previously been [involved with] where they [the buyers] tendered $500,000 down . . ." He did not have occasion to examine a financial statement of the buyers. Other than this testimony, no financial information of any kind is in the record. The prospective buyers did not testify. There is no evidence of the ability of the buyers to perform the contract other than what can be inferred from the testimony of Barnes that they were "ready and willing" to perform.

■ We cannot say this evidence is immaterial. It does tend to establish, albeit indirectly and inferentially, the buyers' ability to carry out the terms of the sale contract. And although· Barnes' testimony would appear to be hearsay in part, *see Manxi et al. v. Kimbley,* 351 Ill.App. 377, 115 N.E.2d 343 (1953) (in an action by broker for commission, testimony by broker that prospective buyer was worth $1.5 million and owned various pieces of valuable property was hearsay and inadmissible), and irrelevant in part, *see White v. Taylor,* 91 Conn. 581, 101 A. 231 (1917) (evidence that 3 months after defendant refused to close the deal, the prospective buyer purchased a saloon elsewhere was irrelevant and inadmissible), the Defendants made no objection to the testimony. We are bound to accept the lower court's finding that the buyers were able.

■ We are not bound, however, by the Chancellor's legal conclusion that the Defendants failed to establish a valid reason for refusing to close the sale. The question remains whether the reasonably prudent person, in the management of his affairs, could be expected to rely on the assertions of the Plaintiff without anything more. We think not. As the Minnesota Supreme Court stated in *Shell Oil Co. v. Kapler,* 235 Minn. 292, 50 N.W.2d 707 (1951), the law does not require that a seller "part with his property to a purchaser where financial ability rests upon nothing more than shoestring speculation or upon attractive probabilities which fall short of reasonable certainty." 50 N.W.2d at 712. The listing contract upon which the Plaintiff sues contains no terms which purport to require that the Defendants accept the Plaintiff's judgment of a buyer's ability to carry out the sale contract. And in the absence of such a provision, the Defendants are presumed to have retained the right to reasonable assurance and satisfaction of the buyer before making the important financial move. As the property is encumbered with two mortgages totaling $£55,000, the Defendants were rightly concerned about the buyers' ability to assume those mortgages. They were rightly concerned, too, about the ability of the buyers to perform under the sale contract in the event they defaulted on the mortgages and the property was foreclosed against. It would have been imprudent for the Defendants to act on the basis of the Plaintiff's assertions when such a substantial economic interest was at stake. The law will support them in their reasonable expectations and in the reasonable management of their affairs.

Since we hold that the Defendants were legally justified in their refusal to close the sale, the judgment is reversed. The costs are taxed to the Plaintiff.

FONES, C.J., and COOPER, BROCK and HARBISON, JJ., concur.

### ON PETITION TO REHEAR

The Plaintiff has filed a petition to rehear. While we deny the Plaintiff's petition, we think a brief response is needed.

Let there be no mistake: a concurrent finding of fact by the Chancellor and the Court of Appeals is binding on this Court. The Court of Appeals concurred in the Chancellor's finding in the present case that the prospective buyers were able, and so we accepted that finding. We are not concerned with the financial ability of the buyers to carry out the terms of the contract. This ability was established at trial. Our concern is that at no time did the Plaintiff give the Defendants sufficient information about the buyers' financial standing, when requested to do so, to allow them to make a reasonably informed decision about the sale.

Consider a broker who finds a buyer worth several million dollars. The broker, however, never conveys this information about this very able buyer to the seller, even when he was requested to furnish such financial information to the seller. At trial, the broker can show he found an "able" buyer. But, of course, the fact that he has proved the buyer's ability to carry out the terms of a sale contract is not enough. He must also show such ability was communicated to the seller in a sufficiently objective manner, so that the seller's duty to act arises.

In this case, when the sellers requested that the broker furnish them with financial information on the buyers, two things became necessary: (1) that the buyer be able and (2) that this fact be revealed to the seller in a manner such that a reasonably prudent person, in the management of his affairs, would act on the information. The information given the Defendants by Barnes is insufficient, as a matter of law, to trigger the Defendants' duty to close the sale.

FONES, C.J., and COOPER, BROCK and HARBISON, JJ., concur.