RICHARD A. MATHURIN
AND ASSOCIATES,
LLC, Plaintiff

v.

Robert E. CROWE, Sr., Defendant

No. CIV.04–29–P–H.

United States District Court,
D. Maine.

Dec. 17, 2004.

John P. Giffune, William C. Knowles, Verrill & Dana, Portland, ME, for Richard A. Mathurin and Associates, LLC, Plaintiff.

Christopher R. Drury, Peter W. Culley, Pierce, Atwood LLP, Portland, ME, for Robert E. Crowe, Sr., Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORNBY, District Judge.

This case involves a dispute over a broker's commission on a deal that collapsed. I presided at a bench trial in this case on December 6–7, 2004. After considering the evidence and the arguments advanced by the parties, I make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Robert Crowe owns two companies that manufacture equipment for lobster trap hauling and boat steering. Crowe's businesses also rent self-storage space.

2. Approaching retirement age, Crowe decided in 2003 to sell the marine equipment parts of the businesses, but to keep the self-storage operations because the latter required little direct involvement.

3. After consulting with his accountant, Crowe decided against an asset sale. He concluded that a stock sale would be more advantageous to him because he would pay the much lower capital gains tax rates whereas an asset sale would yield ordinary income to the corporations taxable at a much higher rate. He believed that a stock sale would also accomplish his desire to avoid the risk of ongoing products liability that might follow the corporations.

4. Crowe engaged Richard A. Mathurin and Associates, LLC ("Mathurin") as an exclusive agent for the sale. He signed an engagement letter that Mathurin provided for a stock sale or a transaction otherwise "acceptable to" Crowe. Crowe set the stock price at $3.3 million.

5. After valuing the companies to Crowe's satisfaction, Mathurin advertised the opportunity in newspapers and on the Internet. As a result, Mathurin produced

a number of interested parties and showed several of them that part of the operations located in Rockland, Maine.

6. Jesse Field submitted a letter of intent proposing to buy Crowe's companies for $3 million. Crowe rejected the proposal because it required owner financing. Instead Crowe proposed a sale of the businesses to Field for $2.5 million cash, but excluding some of the assets. Both Crowe and Field signed a letter of intent to that effect.

7. The letter that Crowe and Field signed specified in both its caption and its terms that it was nonbinding. It gave Field the right to investigate the financial condition and operating results of the companies, along with related matters, so that Field could perform his due diligence.

8. Crowe's production of the financial information was slow and spotty. As small businesses with no debt and therefore no bank requirements, the companies' existing financial papers were limited essentially to the records kept by the bookkeeper, tax returns and annual financial statements. For example, there was no consolidated statement that included a Canadian subsidiary with a different fiscal year.

9. Crowe, through his accountant, was in the process of providing what records he had. His accountant also generated a few new documents, but did not produce all that Field's financial advisor requested.

10. Nevertheless, as Field testified at trial, he did not believe that Crowe was refusing to cooperate, and the failure to produce more documents was not what killed the deal. Based upon what Field had seen, however, Field concluded that $2.5 million was too high a price and that he would try to reduce the price in a final purchase and sale agreement.

11. After the letter of intent was signed, Crowe's main competitor withdrew from the market, and Crowe's profits increased. Crowe referred repeatedly to this development in a series of faxes he sent Mathurin, but I find that this development also did not kill the deal. The letter of intent provided that the sale price of the businesses would be adjusted at the time of sale to reflect any change in shareholder equity following the year-end 2002 financial statements, and Crowe believed that there would be such a change. He also used the development to underline to Mathurin and Field that he was not under any pressure to sell, an obvious negotiating stance in dealing with a potential purchaser who was explicitly not required to go forward with the deal and who might try to negotiate the price downward. But Crowe did not withdraw from the deal on account of the improved profits.

12. When the letter of intent was signed, Crowe informed his accountant for the first time that he wanted to spin off and keep the self-storage businesses. The accountant researched the tax consequences and informed Crowe that he could not sell his stock in the companies within six months before or after such a spinoff without substantially higher tax liability under I.R.C. § 355.

13. Crowe thereupon told Mathurin that he could no longer proceed with the Field transaction because of the tax liability. At first he offered to extend the Mathurin engagement letter so that Mathurin could get its commission if the sale closed after the six-month waiting period, but Crowe also imposed a new requirement of a nonrefundable deposit of $50,000 from Field.

14. Mathurin did not respond to that proposal. Field sent Crowe a note that he was still enthusiastic about the transaction. Then Crowe communicated directly with Field, offering to continue the transaction

after six months had passed, and without the commission to Mathurin.

15. Jesse Field had graduated from Bates College four years earlier with a major in art history and studio art. After college, Field worked in construction, on a family farm, in film production, and in tuna fishing and lobstering. This was to be his first business venture. He learned of the business opportunity through websearching. Field thought the business opportunity would serve his interests because of his recent fishing and lobstering experience. Field owned stock in a family company that had extensive and valuable real estate holdings in the Greenwich, Connecticut, area. Although the stock could not easily be liquidated, his grandfather was willing to make a loan to Field, with the stock as a pledge, for a business venture that met appropriate standards. Field had not yet presented a business plan to his grandfather when Crowe withdrew. Field had a financial advisor who recommended seeking bank financing for the purchase and operations financing from a company like UPS, shipping carrier for the companies. No proposals had been made to a bank or UPS when Crowe announced that he could no longer sell as intended. There was no testimony from Field's grandfather, any potential bank financier, or UPS.

16. I am not persuaded that Field would have successfully closed the transaction on the terms agreed in the letter of intent even if Crowe had not withdrawn the companies from the market on account of the tax problem. I say that because of the parties' different views on price and the fact that financing remained completely uncertain.

17. Mathurin filed this lawsuit against Crowe, seeking its commission, on December 19, 2003.

## CONCLUSIONS OF LAW

1. As a result of summary judgment practice, I previously ordered judgment for Crowe on Mathurin's unjust enrichment and *quantum meruit* claims. *Richard A. Mathurin & Assocs. v. Crowe*, 338 F.Supp.2d 157, 161–62 (D.Me.2004).

2. That ruling left open a contract claim. *Id.* at 161. On that claim, I ruled that the parties' engagement letter made the broker's commission (7.5%) due upon an actual sale, not merely the production of a ready, willing and able buyer. But I also ruled that Crowe as the seller could not avoid the commission simply by preventing consummation of the transaction with a ready, willing and able buyer (whether or not the seller and purchaser had actually entered into an enforceable contract [1]).

3. Mathurin has not shown that it produced a ready, willing and able purchaser.

(a) Testimony revealed that before the deal fell through, Field was no longer a willing purchaser on terms acceptable to Crowe. The terms that Crowe had set in his engagement letter with Mathurin were $3.3 million for a stock sale or other terms acceptable to Crowe. Although Crowe showed that $2.5 million cash was acceptable by proposing it in his counterproposal to Field's first letter of intent (and Field accepted the counterproposal in the letter of intent they both signed), Field planned to offer less before closing the transaction, and there is no evidence that a lower amount would have been acceptable to Crowe.

---

1. In response to the parties' renewed argument on this subject, I now reaffirm that ruling, and conclude specifically that the tax problem here was never a risk allocated to either Mathurin or Field.

(b) Mathurin was unable to present evidence that Field was financially able to complete the transaction. There was no evidence that Field's grandfather would have approved the purchase, nor that any bank or UPS would have provided financing. Mathurin argues that Crowe prevented Field from becoming able to complete the transaction because Crowe failed to provide the documents that were necessary to seeking the grandfather's approval and corporate and bank financing, but that is only argument. Mathurin presented no testimony from a bank, Field's financial advisor, or Field's grandfather that the lack of financial documentation prevented financing or, more importantly, that if the financials had been provided, they would have shown a business on which these potential lenders would have acted favorably, at the proposed price, to lend the amount Field needed.

4. Crowe killed the deal. He did so because of the tax consequences that he discovered after signing the letter of intent. But I do not need to resolve whether Crowe's actions were in bad faith or whether bad faith is required, because I conclude that Mathurin has failed to prove that it produced a ready, willing and able purchaser.

5. Without proof that Mathurin produced a ready, willing and able purchaser, it cannot recover its commission. *See, e.g., Winkelman v. Allen,* 214 Kan. 22, 519 P.2d 1377 (1974); *DeHarpport v. Green,* 215 Or. 281, 333 P.2d 900 (1959). I conclude that this is so, even though it was Crowe who withdrew from the transaction.

Accordingly, judgment shall enter for the defendant. No costs.

So ORDERED.